**Kerry COPSEY, et al.**

v.

**Jerry SWEARINGEN, et al.**

**Civ. A. No. 88–776–A.**

United States District Court,
M.D. Louisiana.

March 5, 1992.

history indicates a departure from the precedent decided under Section 3586. 927 F.2d at 186."

Theodore A. Schirmer, Stephen A. Dixon, Baton Rouge, La., for plaintiffs.

André C. Castaing, Houston C. Gascon, Asst. Attys. Gen., Louisiana Dept. of Justice, New Orleans, La., for defendants.

## SUPPLEMENTAL REASONS FOR RULING ON MOTION

JOHN V. PARKER, Chief Judge.

A jury trial was commenced in this matter on Tuesday, February 18, 1992. At the conclusion of plaintiff's case, defendant moved for judgment as a matter of law pursuant to Fed.Rule Civ.P. 50. The court granted the motion the next morning for reasons orally stated on the record. The court now more fully explains its reasons in writing.

This action under 42 U.S.C. § 1983 arises from plaintiff's operation of a vending stand in the "breezeway" (basement) of the Louisiana state capitol building under a license issued pursuant to the "Louisiana Randolph Sheppard Vending Facility Program." The Program, which is administered by the Division of Blind Services[1], provides certain vocational training and rehabilitation opportunities for the blind, including the operation of vending and concession stands in public buildings in Louisiana.

After several pretrial rulings, the scope of this litigation was narrowed considerably for trial. Plaintiff's claims were limited to his First Amendment claim that defendant Jerry Swearingen, the Director of the Division of Blind Services, terminated plaintiff's license because Copsey had openly criticized the Program.

Defendant's argument in support of his motion for judgment as a matter of law is two-fold. First, defendant contends that case law relating to public employees is applicable by analogy, requiring plaintiff to show that he spoke out about a matter of public concern and that plaintiff failed to

---

1. The Division of Blind Resources is within the Office of Human Development, Department of Social Services.

do so. Second, defendant argues that he was entitled to judgment as a matter of law based upon his defense of qualified immunity.

## THE APPLICABLE STANDARD

■ As the court has previously held, the proper standard to be applied to plaintiff's First Amendment claim is the same as for public employees. There is no dispute that plaintiff is not a salaried employee but rather a licensee under the Program. However, the rules and regulations governing the Program make it abundantly clear that plaintiff's relationship with defendant is more akin to a public employee-employer one than a truly independent contractor dealing with a state agency.

Under the regulations, licenses are issued for an indefinite period for a specific vending location. A vendor's license is subject to suspension or termination for certain enumerated reasons, including noncompliance with the rules or the conditions of his written contract with the State, but only after the vendor is afforded a full evidentiary hearing, much like a civil service employee.

The testimony presented in this case establishes that plaintiff's license was reinstated within a period of several months as the result of an administrative hearing. As part of that proceeding, plaintiff was awarded compensation equal to the amount of revenues he would have taken home from the operation of his stand during that time frame. Plaintiff was then placed on probation by the defendant and that action was likewise reversed upon administrative review.

Other indicia of a public employee type relationship include the fact that the State owns all of the non-expendable vending facility equipment, such as refrigeration units and cash registers, and is responsible for repair and replacement of such equipment. Additionally, the State supplies the vendor with an initial stock of expendable equipment (cups, bowls, napkin dispensers) and inventory. All vendors are trained by the State prior to licensing and are monitored periodically thereafter to ensure that their vending facilities are run efficiently and in compliance with applicable rules and regulations. Vendors are required to keep financial records and to file detailed reports in accordance with the regulations.

In determining the proper standard to be applied, the court is influenced by *Havekost v. U.S. Dept. of Navy*, 925 F.2d 316 (9th Cir.1991). In that case, the plaintiff was a grocery bagger at the commissary at the Puget Sound Naval Station. She did not have an employment contract but was licensed to work as a bagger for customer tips. She became dissatisfied with certain attempts by defendant, the officer in charge of the commissary, to supervise the baggers (such as imposing a dress code and holding baggers responsible for groceries they damaged by bagging). Plaintiff initiated a petition to have the head bagger (who acted as their supervisor and liaison to the commissary management) discharged on the basis that the head bagger had failed to represent the collective interests of the baggers. This triggered a "discussion" between plaintiff and defendant which resulted in the revocation of her license.

The Ninth Circuit recognizes in *Havekost* that because plaintiff was a licensee case dealing with First Amendment rights of public employees are "not directly on point." Havekost argued that the court should apply the "broad principle" that the government may not deny a person a valuable benefit on a basis that infringes upon his right of freedom of speech. The end result being that a licensee would not face the "steeper hurdle" that a public employee has of showing that his speech addresses a matter of public concern.

The Ninth Circuit rejected Havekost's argument and found that a public employee type analysis was appropriate because the dispute was "nothing more than a work place grievance" despite her status as a licensee. The court persuasively argues that it would be inconsistent with the principles stated in *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), to "constitutionalize" a work place grievance.

The court finds further guidance from cases involving staff members at public hospitals. In *Smith v. Cleburne County Hosp.*, 870 F.2d 1375 (8th Cir.1989), cert. denied, 493 U.S. 847, 110 S.Ct. 142, 107 L.Ed.2d 100 (1989), the court found that the association between the independent contractor physician and the hospital was similar to an employer-employee relationship. Consequently, the court found that the physician's speech must address a matter of public concern in order to be protected by the First Amendment.

In *Davis v. West Community Hosp.*, 755 F.2d 455 (5th Cir.1985), a surgeon's staff privileges were permanently suspended by the hospital. The Fifth Circuit found that Dr. Davis' speech was not protected as it did not address a matter of public concern. The court makes no mention of the fact that an employer-employee relationship was lacking. See also, *Caine v. Hardy*, 943 F.2d 1406 (5th Cir.1991) (dealing with a First Amendment claim of a anesthesiologist who lost his staff privileges at a public hospital).

## "MATTER OF PUBLIC CONCERN" TEST

This court has no reservations that Copsey's situation likewise involves a work place grievance that warrants application of the Pickering–Connick analysis.[2] Too often, it is overlooked that federal courts are courts of limited jurisdiction and that not every wrong or injustice occurring within a public agency amounts to a constitutional violation.

In *Connick*, supra, the Supreme Court states:

> We hold only that when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior.
> 103 S.Ct. at 1690.

The Supreme Court further observes that:

To presume that all matters which transpire within a government office are of public concern would mean that virtually every remark—and certainly every criticism directed at a public official—would plant the seed of a constitutional case. While as a matter of good judgment, public officials should be receptive to constructive criticism offered by their employees, the First Amendment does not require a public office to be run as a roundtable for employee complaints over internal office affairs.
103 S.Ct. at 1691.

■ Whether or not plaintiff's speech addresses a matter of public concern is a question of law to be resolved by the court rather than the jury. *Dodds v. Childers*, 933 F.2d 271 (5th Cir.1991); *Terrell v. University of Texas System Police*, 792 F.2d 1360 (5th Cir.1986), cert. denied, 479 U.S. 1064, 107 S.Ct. 948, 93 L.Ed.2d 997 (1987). It has been repeatedly held that the court must consider "the content, form, and context of a given statement, as revealed by the whole record." *Connick*, supra, 103 S.Ct. at 1690; *Dodds*, supra; *Ayoub v. Texas A & M University*, 927 F.2d 834 (5th Cir.1991), cert. denied, —— U.S. ——, 112 S.Ct. 72, 116 L.Ed.2d 46 (1991).

It has also been recognized in numerous decisions following *Terrell*, supra, that:

> Because almost anything that occurs within a public agency could be of concern to the public, we do not focus on the inherent interest or importance of the matters discussed by the employee. Rather, our task is to decide whether the speech at issue in a particular case was made primarily in the plaintiff's role as citizen or primarily in his role as employee. In making this determination, the mere fact that the topic of the employee's speech was one in which the public might or would have had a great interest is of little moment.
> 792 F.2d at 1362. (Footnotes omitted)

■ Additionally, it is well established that plaintiff bears the burden of demonstrating that his speech addresses a matter

---

**2.** *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); *Connick v.* *Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983).

of public concern. *Rankin v. McPherson*, 483 U.S. 378, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987); *Noyola v. Texas Dept. of Human Resources*, 846 F.2d 1021 (5th Cir.1988). In this case, plaintiff has failed to meet that burden.

Defendant's reasons for terminating plaintiff's license are set forth in a letter to plaintiff dated September 10, 1987. (Plaintiff's Exh. No. 2) In support of the general conclusion that plaintiff had acted in a fashion that had "an adverse effect on the program," defendant cites the following specific activity:

1. Publicity adverse to the program on Baton Rouge Channel 2 and in letters to the National Federal of the Blind, both stimulated by you.

2. Continued reports from individuals, primarily building management, as to your complaints about the facility and the Capitol.

3. Concerns voiced by several other operators over the negative impact on the program of your accusations adverse to the agency and the program and other information released by you to the press.

4. Contacts directly with specific Senators and Representatives regarding various areas of your dissatisfaction.

5. Contacts with suppliers and others after policy violations were specifically brought to your attention.

The testimony at trial centered on a letter from plaintiff to the President of the National Federation of the Blind dated May 30, 1987, a brief television interview on June 15, 1987, and reference to discussions between plaintiff and Senator Osterberger and Representative Gaudin. Despite a reference at the beginning of the letter (Plaintiff's Exh. No. 3) to "the vending program in general in our State," the letter makes it plain that plaintiff's chief concern was to improve his personal situation within the capitol building.

The tone of the letter is that members of the Arts and Historical Society had made false complaints to Blind Services and had caused unreasonable restrictions to be placed on his business in order that they could run a shop in the tower of the capitol building more profitably. Plaintiff felt that he had been "displaced"[3] because the prior licensee under the Program, Chris Hall, had operated a facility in the tower prior to renovations to the capitol. Plaintiff refers to several changes that had taken place when that vendor, Chris Hall, was moved to the basement breezeway. While in the letter plaintiff seeks compensation personally and on behalf of Chris Hall arising from changes in the size and location of the facility, it is clear that plaintiff's complaints are all directly related to his own financial situation.

A video tape of plaintiff's television interview was played at trial. This was a very brief appearance that was part of a news broadcast in mid June, approximately a month after the letter was written. The interview begins by noting Copsey's anger over unfair treatment at the capitol in being ejected from the tower. Some remarks are made concerning another licensee and trainees under the Program. There is a brief reference to treatment of totally blind and partially sighted vendors. The appeals process is summarized by the reporter. Again, while the news broadcast begins to explore an area that may well be a matter of public concern, i.e. the running of the Program in general, Copsey's foremost concerns are his own.

The testimony relating to plaintiff's discussions with his State representative and senator are scant at best. It appears that Copsey asked Senator Osterberger to request an opinion from the Attorney General's Office relating to La.R.S. 46:333, which provides for a "preference to blind persons" in the operation of vending stands.

While plaintiff claims that he was motivated by a big problem in the program,

---

**3.** It is undisputed that plaintiff himself never occupied the tower location, although his prede- cessor vendor did.

plaintiff failed to explain the precise nature of the opinion of the Attorney General which he sought, nor did he explain how the opinion would actually be advantageous to other vendors. The evidence indicates that plaintiff's situation in the capitol building involves several unique aspects. Under the circumstances, the court finds that the possibility that his request might have somehow benefited other participants is remote at best. It is even less clear as to what Copsey may have discussed with Representative Gaudin. Moreover, the time frame of these discussions was not made plain, presumably they followed the May 30th letter.

The court is firmly convinced that plaintiff's speech was directed toward improving his personal situation at the capitol. While some matters of interest to the public may have been touched upon, these matters were raised to promote his own interests and were but a small part of his total complaint. The public form and context of the television interview likewise loses significance in view of the fact that plaintiff basically sought to air a personal grievance.[4] In short, plaintiff failed to prove that he spoke predominantly as a citizen on a matter of public concern.

QUALIFIED IMMUNITY

 Finally, as noted at trial, the court finds that defendant is entitled to qualified immunity in any event. Under the circumstances, it would not have been sufficiently clear that plaintiff's speech was protected under the First Amendment. Consequently, a reasonable state official would have been justified in believing that he did not violate plaintiff's constitutional rights in terminating his license. See *Noyola v. Texas Dept. of Human Resources*, 846 F.2d 1021 (5th Cir.1988).

Accordingly, the court's ruling on the motion for directed verdict is maintained as supplemented herein.

---

**4.** A proclamation from the steps of the state capitol building would not turn a personal grievance into a matter of public concern.

*Caine v. Hardy*, 943 F.2d 1406, 1416 (5th Cir. 1991).