UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 92-3233
_____


KERRY COPSEY and CINDY COPSEY,

Plaintiffs-Appellants,

versus

JERRY SWEARINGEN, Individually and
as the Director of Blind Services,
ET AL.,

Defendants-Appellees.

_____

Appeal from the United States District Court for the
Middle District of Louisiana
_____
(October 25, 1994)


Before GARWOOD and HIGGINBOTHAM, Circuit Judges, and SCHWARTZ,[*]
District Judge.

GARWOOD, Circuit Judge:

Plaintiff-appellant Kerry Copsey (Copsey) operated a vending facility in the Louisiana state capitol building.[1] Copsey, who is blind, received his license through a program operated by the Louisiana Division of Blind Services, which gives preferential

_____

[*] Senior District Judge of the Eastern District of Louisiana, sitting by designation.

[1] After oral argument of this appeal, Kerry Copsey died and his widow, Cindy Copsey, in her capacity as administratrix of Kerry Copsey's estate, has been substituted in his stead as an appellant pursuant to FED. R. APP. P. 43(a).

treatment to blind persons who desire to operate concession stands in public buildings. Copsey became convinced that state officials were permitting an organization to operate a concession stand in another part of the capitol building in violation of his exclusive vending rights. After Copsey publicly aired his grievances about the program, his license was terminated. Although he was eventually reinstated and compensated for his loss, Copsey sued numerous defendants, alleging among other things that the violation of his exclusive vending rights deprived him of property without due process of law and that the revocation of his license was in retaliation for the exercise of his First Amendment rights. The trial court eventually denied all of Copsey's claims and Copsey now appeals. We affirm in part, reverse in part, and remand.

### Facts and Proceedings Below

Copsey and his wife Cindy Copsey instituted this action on September 9, 1988. The named defendants in the suit were (1) Jerry Swearingen, the director of the Division of Blind Services at all times material to this case; (2) Guy Dicharry, the manager of the blind vendor program in the capitol;[2] (3) Phillip Reichert, an assistant director of the Division of Blind Services; (4) John A. Alario, Jr., the Speaker of the Louisiana House of Representatives; (5) Samuel B. Nunez, Jr., the President of the Louisiana Senate; (6) Sylvia Duke, a member of the Senate staff; (7) Barbara Goodson, a member of the House of Representatives staff; (8) Charles

---

[2] Mr. Dicharry died prior to the judgment below and is no longer a party inasmuch as no one has been substituted as a defendant for him.

Schwing, the state capitol architect; (9) Mitchell "Homer" Stockman, a management analyst for the Division of Blind Services; and (10) the Foundation for Historical Louisiana, a private, non-profit organization. Copsey sought declaratory and injunctive relief as well as money damages.[3]

The facts leading up to Copsey's suit are as follows. Louisiana permits blind vendors to operate concession stands in public buildings pursuant to Louisiana Revised Statute § 46:333.[4] The program is administered by Louisiana's Division of Blind Services (the Division) of the Department of Health and Human

---

[3] Copsey's claims for injunctive and declaratory relief have been mooted by his death (see note 1, *supra*). On remand the district court shall dismiss these claims as moot. Copsey's vendor's license, by its express terms, automatically wholly terminated on his death. The parties are in agreement that Copsey's damages claims survived his death and pass to his estate.

[4] That law provides in pertinent part:

"A. State agencies, boards, commissions, and institutions owning, maintaining, or controlling state property shall in all cases give preference to blind persons . . . in the operation of vending stands, vending machines, and other small business concessions to be operated on the premises. No other vending stands, vending machines, or small business concessions shall be operated on the same premises with vending stands, vending machines, or other small business concessions operated, or contemplated, under the provisions of this Section. No blind person under this Subpart shall be required to pay any fee, service charge, or equivalent thereof upon the operation of a vending stand, vending machines, and other small business concessions in public buildings or premises, nor shall the blind person be disturbed in the security of the operation of the vending stand, vending machine, and other small business concession in any way, without reasonable or just cause." LA. REV. STAT. ANN. § 46:333 (West 1982).

3

Resources,[5] which issues licenses to program participants. Prior to 1985, a vending facility was run by a blind person (not Copsey) on the 27th floor of the observation tower of the capitol building in Baton Rouge. When renovations to the capitol were commenced in the mid-1980's, however, the observation tower was closed. In July 1985, the Division entered into an agreement with the Legislative Budgetary Control Council (the Council), which manages the allocation of space in the capitol, to allow a blind vendor to operate a concessions area in the breezeway basement of the capitol building. At that time, however, no one was issued a license to operate the basement concession. In May 1986, the Council signed a lease with the Foundation for Historical Louisiana, Inc. (the Foundation), a private non-profit organization, to operate a museum shop in the observation tower.

In February 1987, the Division issued Copsey a license to operate the concession stand in the basement of the capitol under the terms of the 1985 agreement between the Division and the Council. Copsey was the first vendor to receive a license to operate in the capitol basement and at no time had he operated a concession stand in the tower. At some point, Copsey became unhappy with the administration of the program and made many complaints to Swearingen. In Copsey's view, Louisiana Revised Statute § 46:333 gave him the exclusive right to operate concessions in the capitol building, including the observation tower. Copsey made numerous demands upon the Division, including

---

[5] Now known as the Department of Social Services/Division of Rehabilitation Services.

4

that he be allowed to operate his vending facility stand in the space being occupied in the observation tower by the Foundation. In late May or early June 1987, Copsey distributed to the news media a long letter addressed to the President of the National Federation of the Blind which was critical of the Division's administration of the blind vendor program. He also aired his grievances on a local television broadcast.

In mid-June 1987, Swearingen sent Copsey a memo informing him that Copsey's wife would no longer be allowed to visit the concession stand during business hours. The directive was promptly withdrawn but the bad blood between Copsey and Swearingen remained. On September 9, 1987, a meeting, initiated by Swearingen, was held between the two men. At the meeting, Swearingen offered to give Copsey another vending location in a different government building. Copsey agreed to consider changing locations and went to examine the suggested alternate site with Dicharry. After talking with the vendor operating that concession, Copsey informed Dicharry that he would not be willing to go to the new location. Copsey also communicated this to Swearingen, who said that he had no alternative but to terminate Copsey. On September 10, 1987, Dicharry and Reichert delivered Copsey a letter from Swearingen informing Copsey that his position at the state capitol vending facility and his participation in the blind vendor program would be terminated at the close of business that very day. At Copsey's request, Swearingen composed a second letter, also dated September 10, 1987, which set forth the reasons for Copsey's termination. The letter cited five reasons for Copsey's termination:

"1.  Publicity adverse to the program on Baton Rouge Channel 2 and in letters to the National Federation of the Blind, both stimulated by you.

2.  Continued reports from individuals, primarily building management, as to your complaints about the facility and the Capitol.

3.  Concerns voiced by several other operators over the negative impact on the program of your accusations adverse to the agency and the program and other information released by you to the press.

4.  Contacts directly with specific Senators and Representatives regarding various areas of your dissatisfaction.

5.  Contacts with suppliers and others after policy violations were specifically brought to your attention."

The letter also stated in conclusion:

"The above actions on your part were perceived as having an adverse effect on the program through creating the potential of loss of this location and other aspects of the total program."

Copsey appealed his termination, and a hearing before an administrative law judge (ALJ) was scheduled for February 10, 1988. One day prior to the hearing, on February 9, Swearingen delivered a letter to Copsey which vacated the September 10 termination. The letter indicated that Copsey would be placed on probation and would be considered for future statewide vending facility openings as they occur. The next day, Copsey and the Division stipulated to the following: that Copsey would be reinstated into the blind vendor program retroactive to September 10, 1987; that he would be compensated at a rate of $720 per month from September 10, 1987, for the time that he was removed from the vending stand; that he would receive $500 in attorney's fees; that certain documents inserted into his file by the Division would be removed; and that

6

he would be placed on probation until February 24, 1988, at which time a hearing would be held to determine whether Copsey should be reinstated at the capitol basement vending facility. The ALJ adopted these stipulations as his decision. On February 24, 1988, the hearing on Copsey's probation was held. The ALJ concluded that the Division had not established cause for placing Copsey on probation and entered findings to that effect. Copsey resumed operation of the basement concession stand where he remained until his death following the district court's judgment.

The instant lawsuit was filed September 9, 1988, and was referred to a magistrate judge and, upon his recommendation, the district court on August 4, 1989, dismissed a number of Copsey's claims. On April 23, 1991, the district court granted the defendants' motion for summary judgment as to all of Copsey's claims except for the claim that Swearingen revoked Copsey's license in retaliation for the exercise of his First Amendment rights. *See Copsey v. Swearingen*, 762 F.Supp. 1250 (M.D. La. 1991) ("*Copsey I*"). A jury trial was commenced on Copsey's speech claim against Swearingen but, at the close of plaintiff's case, the district court on March 5, 1992, granted Swearingen's motion for a directed verdict. *See Copsey v. Swearingen*, 790 F.Supp. 118 (M.D. La. 1992) ("*Copsey II*"). Copsey now appeals from these three rulings.[6]

---

[6] The notice of appeal was filed both by Copsey and his wife, Cindy. Based upon the Copseys' complaint, it appears that Cindy's only claim was that she was denied her right to free association when, in June 1987, the Copseys were told that Cindy would not be allowed to visit her husband's stand during working hours. The magistrate held that this claim was prescribed by

## Discussion

Copsey argues that the district court erred in dismissing his claims under the First and Fourteenth Amendments and his conspiracy claim. He also complains of the court's denial of his request for declaratory and injunctive relief, his motion to join an additional party, and his motion for reconsideration of the court's April 23, 1991, ruling. As noted (note 3, *supra*), the claims for declaratory and injunctive relief are moot. Otherwise, we affirm the district court on all counts with the exception of its decision to grant Swearingen a directed verdict on Copsey's First Amendment claim.

I.   Copsey's Property ClaimSQExclusive Right.

Copsey argues that he has been unconstitutionally deprived of property without due process of law. *See* U.S. Const., amend. XIV, § 1. In his view, Louisiana Revised Statute § 46:333 gives him the exclusive right to operate concession stands in the state capitol building, and the Foundation's occupation of the tower violates this right. Copsey names the Foundation, Alario, Nunez, Duke, Goodson, and Schwing as the parties responsible for this alleged trespass. The district court ruled that all defendants were entitled to qualified immunity on this claim. *Copsey I*, 762 F.Supp. at 1258-59.

There is no doubt that property rights created under state law are protected by the Fourteenth Amendment. *See, e.g., Board of*

---

virtue of the fact that the relevant events took place more than a year before suit was filed in September 1988. Because the Copseys make no argument on appeal that this ruling was incorrect, it must stand. Thus, Kerry Copsey (now Cindy Copsey in her capacity as administratrix of Kerry Copsey's estate) is the only plaintiff with remaining claims in this case.

*Regents v. Roth*, 92 S.Ct. 2701 (1972). A careful parsing of Copsey's claim, however, belies the view that he has been deprived of any property right which state law has granted him. First, Copsey cannot complain that the May 1986 agreement between the legislature and the Foundation authorizing the Foundation to set up shop in the tower deprived him of any property. Copsey was not issued his license to operate in the capitol basement until February 1987 and thus could have no rights with respect to the capitol until at least that time. Moreover, because Copsey did not file suit until September 1988, any claim he might have for events occurring before September 1987 would be barred by the one-year statute of limitations applicable to his claims. Second, Copsey cannot claim that he is entitled to occupy the tower himself. The contract between the Legislature and the Division of Blind Services to allow a blind vendor to operate in that part of the capitol designated the basement, and the basement only, as the location to be used. Likewise, Copsey's license permits him to operate in the basement of the capitol, not the tower. That a blind vendor once occupied the tower is of no moment. Lastly, section 333, however one interprets it, cannot be construed to mean that a blind vendor is entitled to select the vending location of his choosing, and Copsey does not contend otherwise.

At the most, then, Copsey is left with the argument that section 333 gives him the right to be the exclusive vendor in the entire capitol, and therefore that the competition provided by the Foundation's shop deprived him of property. Section 333 arguably gives Copsey that rightSQbut only arguably. It provides that

"State agencies, boards, commissions, and institutions owning, maintaining, or controlling state property shall in all cases give preference to blind persons . . . in the operation of vending stands" and that "No other vending stands . . . shall be operated on the same premises."  The defendants counter that the strictures of section 333 do not apply to the state capitol building.  While conceding that the capitol building is state property, the defendants question whether the legislature (which presumably owns, maintains, or controls the capitol) is a state agency, board, commission, or institution.  They bolster their argument with Louisiana Revised Statute § 49:150.1, which provides:

> "A. Notwithstanding any other provision of law to the contrary, and particularly any contrary provision of R.S. 49:146, the allocation and use of space within the state capitol, pentagon courts buildings, and the Old Arsenal Museum shall be as provided in this Subpart.  The provisions of this Subpart shall apply to the subbasement, basement, and all floors of the state capitol, all buildings in the pentagon courts, and the Old Arsenal Museum.
>
> . . . .
>
> E. (1) All areas of the state capitol, pentagon courts buildings, and Old Arsenal Museum not allocated under the provisions of Subsections B and C herein shall be for the sole use of the legislature, its agencies and officers, and the employees of the legislature and its agencies." LA. REV. STAT. ANN. § 49:150.1 (West. Supp. 1993).

The defendants argue that section 150.1, which antedates section 333, gives the legislature complete control over space within the capitol building notwithstanding any other provision of law.[7] So far as we know, the Louisiana courts have not attempted to

---

[7]    The district court, seeming to agree with the defendants' construction of section 150.1, expressed the view:

10

reconcile section 333 with section 150.1. We note, however, that a Louisiana appellate court recently denied Copsey's request for a writ of mandamus on his claim that the Foundation's lease violates section 333. *See Copsey v. Joint Legislative Budget Control Council*, 607 So.2d 841 (La. App. 1st Cir. 1992). At the end of the day, the most we can say is that it is unclear whether section 333 confers upon Copsey a property interest protectable by the Fourteenth Amendment. Therefore, we agree with the district court that the defendants were entitled to qualified immunity. A state official cannot be held liable for depriving a plaintiff of a property right unless that right was clearly established at the time of the deprivation. *See Hopkins v. Stice*, 916 F.2d 1029, 1031 (1990). Copsey's view of section 333, as we have said, is an arguable one; he cannot seriously maintain, however, that his view is clearly established as the law in this Court or any other. *Id*.

Even if one assumes *arguendo* that Copsey does have a state property right by virtue of section 333, he has not shown that he has been deprived of it *without due process of law*. When a plaintiff alleges that he has been deprived of property because of the random and unauthorized acts of government officials and seeks a post-deprivation remedy, there is no denial of due process if the state provides adequate post-deprivation remedies. *See Parratt v. Taylor*, 101 S.Ct. 1908 (1981); *Hudson v. Palmer*, 104 S.Ct. 3194

"The phrase, 'Notwithstanding any other provision of law to the contrary' serves as a powerful indication that the Legislature intended to keep complete control of all space in the capitol in its own hands, even if other laws were to the contrary." *Copsey I*, 762 F.Supp. at 1258.

11

(1984); *Caine v. Hardy*, 943 F.2d 1406 (5th Cir. 1991) (en banc). Copsey's claim falls squarely within this rule. First, the deprivation of which Copsey complains was a random and unauthorized act, which he alleges was in violation of state law. Second, it is clear that what Copsey seeks is a post-deprivation remedy. Indeed, it can only be that. It cannot be said that Copsey was deprived of property prior to the time that he obtained his license, and once he did so, the deprivation had already occurred, for the Foundation was already in the capitol. Therefore, there is no way that Copsey could have been granted a predeprivation remedy in this instance. Third, Copsey has not demonstrated that Louisiana state law affords an inadequate remedy. In fact, the Louisiana appellate court that denied his request for mandamus reasoned that Copsey had not "proved his entitlement to this extraordinary remedy" because he "also sued under ordinary process, asking for injunctive relief as well as a declaratory judgment. Therefore, other remedies would appear to be available at law to plaintiff." *Copsey v. Joint Legislative Budgetary Control Council*, 607 So.2d 841, 843 (La. App. 1 Cir. 1992). In essence, Copsey complains that some of the defendants have violated state law, *i.e.*, section 333. In the absence of evidence to the contrary, we must presume that Louisiana's court system is capable of redressing violations of state law. *Cf. Marshall v. Norwood*, 741 F.2d 761, 763 (5th Cir. 1984) ("This Court has found that Louisiana law provides an adequate remedy for negligent action.").

II. Copsey's Procedural Due Process Claim—License Termination.

Copsey argues that the termination of his license was without due process and therefore in violation of the Fourteenth Amendment. The district court ruled that the hearing held on February 10, 1988, satisfied Copsey's right to procedural due process. *See Copsey I*, 762 F.Supp. at 1260-61. We agree. Copsey does not allege that the post-deprivation procedure used in this case itself violated due process. Nor is there any doubt that an adequate post-deprivation hearing can satisfy due process in this context, as noted above. *See Parratt v. Taylor*, 101 S.Ct. at 1915. Copsey's only complaint appears to be about the outcome of the hearing. One day prior to the hearing, Copsey and the Division of Blind Services entered into an agreement that Copsey would be reinstated into the blind vendor program, that he would be compensated $720 a month for the time that he was out of his location, that he would receive $500 in attorney's fees, that certain documents placed in his file would be removed, and that he would be placed on probation. The ALJ adopted these stipulations as his decision. Two weeks later, Copsey's probationary status was ended. We believe that Copsey was afforded due process. We are unsympathetic to the claim that it was improper for the ALJ to adopt as a remedy that to which Copsey had freely agreed. What is more, since Copsey was returned to his concession stand in the capitol basement, with agreed compensation for the intervening period and attorney's fees, he was in the same position that he had been in prior to the termination of his license. *See also Robinson*

13

*v. Boyer*, 825 F.2d 64, 67 (5th Cir. 1987).

III. Copsey's First Amendment Claim.

Copsey argues that the termination of his license in September 1987 was in retaliation for the exercise of his First Amendment right to free speech. There is really no dispute that Copsey's license was terminated, at least in part, because of his speech. The defendant's brief concedes that "Copsey was removed from the vending facility located in the breezeway of the Louisiana State Capitol Building for the reasons stated in the two letters" of September 10 from Swearingen. The second letter, which was drafted by Swearingen for the express purpose of setting forth the reasons for the termination of Copsey's license, cited Copsey's appearance on local television, his letter to the National Federation of the Blind, and his communications with Louisiana state senators and representatives. There can be no doubt that these are First Amendment activities. That Copsey was punished for speaking, however, does not necessarily prove that his First Amendment rights were violated. Analogizing Copsey's status as a license-holder to that of a public employee, the district court analyzed Copsey's claim under the two-prong test announced in *Pickering v. Board of Education*, 88 S.Ct. 1731 (1968), and *Connick v. Myers*, 103 S.Ct. 1684 (1983); *see Copsey II*, 790 F. Supp. at 120-23. Under *Pickering* and *Connick*, when the state penalizes a public employee for speaking, no First Amendment violation occurs unless the speech is "fairly characterized as constituting speech on a matter of public concern," *Connick*, 103 S.Ct. at 1690, and the employee's interest in speaking outweighs "the interest of the State, as an

14

employer, in promoting the efficiency of the public services it performs through its employees." *Pickering*, 88 S.Ct. at 1734-35. In the district court's view, Copsey had failed to meet the threshold testSQthat the speech be on a matter of public concernSQand therefore suffered no violation of his First Amendment rights. *Copsey II*, 790 F.Supp. at 122-23. The court also held that Swearingen was entitled to qualified immunity. *See id*. at 123.

Copsey argues that, because he is not employed by the state, the *Pickering/Connick* test is misplaced here and his claim should instead be evaluated under a more First Amendment friendly standard. We cannot entirely agree with Copsey that the *Pickering/Connick* test finds no application in this context. Copsey is not a public employee. Nevertheless, the Rules and Regulations of the Randolph Sheppard Vending Facility Program (June 1987) bear the mark of an employment-type relationship. After being selected, vendors are trained by the state. The vendors are issued their licenses for an indefinite term, but may be suspended or terminated for noncompliance with program rules and regulations after a full evidentiary hearing. Section 333 itself provides that blind vendors may not be "disturbed in the security of the operation of the vending stand" without reasonable or just cause. The actual vending space is owned by the state; the state furnishes vendors with such substantial equipment as refrigerators, microwave ovens, and cash registers. The vendor must maintain this equipment, but the state is responsible for making repairs. The vendor is provided with an initial inventory, title to which

remains with the state, and he must replace the inventory upon his resignation. There is some evidence in the record that the vendors do not have complete freedom to choose their inventory. On the other hand, vendors are unlike public employees in important respects. They are not salaried; their income is whatever profits they make from the operation of the stand. The vendors presumably set their own hours and prices. Copsey had even hired an employee of his own. On balance, however, it seems to us that Copsey was more like a public employee than an ordinary citizen, and therefore that *Pickering* and *Connick* have relevance to this situation.

The applicability of the *Pickering/Connick* test to certain license holders, moreover, has been accepted in prior cases in this Circuit and others. In *Davis v. West Community Hospital*, 755 F.2d 455, 461 (5th Cir. 1985), we analyzed the First Amendment claim of a surgeon whose staff privileges were permanently suspended by a public hospital under *Pickering* and *Connick*. We made no mention of the fact that the surgeon was not an employee of the hospital. Similarly, in *Caine v. Hardy*, 943 F.2d 1406, 1415-16 (5th Cir. 1991), this Court sitting *en banc* used *Pickering* and *Connick* to evaluate the free speech claim of an anesthesiologist who lost his clinical privileges at a public hospital. Even the dissenters in *Caine* argued within the *Pickering* and *Connick* framework. *See id*. at 1421 (Williams, J., dissenting).

Other circuits have taken a similar approach. *Smith v. Cleburne County Hospital*, 870 F.2d 1375 (8th Cir.), *cert. denied*, 110 S.Ct. 142 (1989), also involved a doctor deprived of staff privileges at a public hospital. The court recognized that the

16

plaintiff "was an independent contractor rather than a salaried employee of the Hospital," *id*. at 1381, but applied *Pickering* and *Connick* nonetheless. The court stated:

> "While there is not a direct salaried employment relationship, there is an association between the independent contractor doctor and the Hospital that have similarities to that of an employer-employee relationship. For instance, there is an application process for privileges, there are required duties to be performed by both parties, and there are potential liabilities each party is responsible for jointly and severally for tortious conduct. As a result of these similarities, the application of the *Pickering* balance test and its progeny in this case is appropriate." *Id*.

Finally, in *Havekost v. United States Dep't of the Navy*, 925 F.2d 316 (9th Cir. 1991), plaintiff was a grocery bagger licensed to work at a military installation. She sued after her license was revoked allegedly in retaliation for her speech. The Ninth Circuit recognized that *Pickering* and *Connick* "are not directly on point" because "Havekost was a licensee on the Navy's premises rather than a salaried employee." *Id*. at 318. The court concluded, however, that "[b]ecause Havekost's dispute, like that of the plaintiff in *Connick*, is nothing more than a workplace grievance, ruling for her would be inconsistent with the principle stated in *Connick*." *Id*. *Havekost* cited both *Smith* and *Davis* in support of its statement that "*Pickering-Connick* immunity has been applied, moreover, in cases where an employer-employee relationship did not exist." *Id*. at 319.

We now turn to the question whether Copsey's speech was on a matter of public concern. The district court's answer, as we have said, was no. This is an issue that we review *de novo*. *See Rankin v. McPherson*, 107 S.Ct. 2891, 2898 n.9 (1987). Whether Copsey's

17

speech addresses a matter of public concern "must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick*, 103 S.Ct. at 1690. The principles that will guide our determination were summarized recently in *Dodds v. Childers*, 933 F.2d 271 (5th Cir. 1991):

> "This court has previously found that issues rise to the level of public concern if an individual speaks primarily as a citizen rather than as an employee, or if the information conveyed would be of relevance to the public's evaluation of the performance of governmental agencies. The existence of an element of personal interest on the part of an employee in the speech does not prevent finding that the speech as a whole raises issues of public concern. On the other hand, an employee cannot transform a personal conflict into an issue of public concern simply by arguing that individual concerns might have been of interest to the public under different circumstances. . . .
> To rise to the level of public concern, the speech must have been made primarily as a citizen rather than as an employee. The court may therefore be required to assess the primary motivation of the speaker in evaluating whether her speech addresses a matter of public concern." *Id.* at 273 (footnotes and internal quotation marks omitted).

Based upon the reasons offered for the termination of Copsey's license in Swearingen's September 10, 1987, letter, the district court determined, and we agree, that there were three occasions on which Copsey spoke that are relevant here: first, his letter to the National Federation of the Blind; second, his televised interview with a news reporter; and third, his discussions or contacts with his state representatives. Fidelity to the First Amendment requires that we examine all three to see if they are fairly characterized as speech on matters of public concern.

Most of the letter to the National Federation of the Blind, dated May 30, 1987, and addressed to the Federation president, is

devoted to Copsey's complaints about his personal situation in the capitol basement. Copsey states that his vending space is inadequate, that unreasonable restrictions have been placed upon his business, that he has been falsely accused of being rude and discourteous, and that various capitol officials have been making things difficult for him. Copsey relates at length his belief that the blind vendor who had previously worked in the capitol, Chris Hall, was removed from the capitol tower by members of the Arts and Historical Society so that they could occupy that more desirable location. Copsey closes the letter by requesting the Federation's assistance in a possible legal action on behalf of himself and Chris Hall. Despite the obvious personal tone of the letter, the personal for Copsey is also the public. His complaints and allegations in the letter were tied to his concerns about the management of the blind vendor program as a whole. The first sentence of the letter in fact expresses an intent to explain "the situations [sic] at the Louisiana State Capitol and the vending program in general in our State." The management of a public program, of course, is an issue of public interest. His allegation that "members of the Arts and Historical Society, a private organization, and their political friends are attempting to remove the blind from the State Capitol" may be fanciful, but if true it would certainly be of public concern. The public has an interest in (not to say an appetite for) hearing of the wildest conspiracy theories as well as the most conventional wisdom.

Copsey's television appearance aired on June 17, 1987. The brief broadcast apparently concerned Copsey's displeasure at being

19

excluded from the capitol tower.

Finally, there is the issue of Copsey's communications with his state representatives. The evidence is sketchy, but apparently Copsey asked Senator Osterberger to request the Louisiana Attorney General to issue an opinion on section 333. Certainly, the legal meaning of this statute raises an issue of some public concern.

While it is plain that much of Copsey's speech was in no small part motivated by personal concerns, some of it clearly addressed matters of public interest and concern beyond his individual situation. The part of speech which is on matters of public concern does not lose its First Amendment protection merely because other parts are essentially related to personal workplace concerns.[8] Whether section 333 extended to the capitol building as a whole, whether section 333 is subject to section 150.1, and whether the Foundation's operation in the tower is lawful, are all matters of general public concern, apart from their effect on Copsey. The larger essence of Copsey's publicly aired speech as to these matters was not related to the ongoing operation of his own stand, or to the day-to-day interaction with the Division which that operation entailed, as in the typical *Pickering/Connick*-type case. These aspects of Copsey's speech, so far as they might impact his own situation, would impact aspects of it that were not those which are analogous to the employee-employer relationship.

---

[8] *See, e.g., Brawner v. City of Richardson*, 855 F.2d 187, 192 (5th Cir. 1988) ("it is clear that only a portion of a communication need address a matter of public concern"; footnote omitted); *Thompson v. City of Starkville*, 901 F.2d 456, 464-65 (5th Cir. 1990).

Even though we have held that the *Pickering/Connick* test is relevant to Copsey's claim, we remain mindful that it is indisputably clear that he was *not* an employee, but was only in a situation partly analogous thereto. There is sufficient evidence from which a fact-finder could conclude that Swearingen terminated Copsey's license because of those aspects of Copsey's speech which addressed matters of public concern, and would not have done so but for such protected speech.

We also conclude that the district court erred in awarding qualified immunity to Swearingen. The relevant question here is not whether the law was settled in the abstract, but whether, measured by an objective standard, a reasonable official would have known that his action was illegal. *See Click v. Copeland*, 970 F.2d 106, 109 (5th Cir. 1992). A reasonable officer, we think, would have to know that revoking a blind vendor's license in retaliation for such publicly-aired complaints violated the First Amendment.

IV. Copsey's Conspiracy Claim.

Copsey argues that there existed a conspiracy among the defendants to violate his constitutional rights. The district court dismissed all of Copsey's conspiracy claims when it granted the defendants' motion for summary judgment. *See Copsey I*, 762 F.Supp. at 1260. Because we hold that Copsey's Fourteenth Amendment rights were not violated, Copsey cannot claim that there was a conspiracy to violate those rights. But it remains a possibility that some or all of the defendants conspired to revoke Copsey's license in violation of the First Amendment. As we read his complaint, Copsey alleges that Swearingen, Alario, Nunez,

Dicharry, Reichert, and Stockman were part of this conspiracy. Copsey's complaint alleges Swearingen "is responsible for the unconstitutional revocation of Plaintiff Kerry Copsey's blind vendors license"; that Alario and Nunez are "responsible for conspiring to unconstitutionally revoke Kerry Copsey's blind vendors license"; that Dicharry and Reichert are "responsible for enforcing the revocation of Kerry Copsey's blind vendors license;" and that Stockman is "responsible for conspiring to or failing to prevent a conspiracy to unconstitutionally revoke Kerry Copsey's blind vendors license." We believe that the defendants other than Swearingen can be liable for conspiring to violate Copsey's First Amendment rights only insofar as they conspired *with Swearingen*, who was the person with the authority to terminate Copsey's license and actually did so. We also note that the complaint accuses Swearingen of being "responsible" for the termination and the other defendants of being responsible for "conspiring in" or "enforcing" or "failing to prevent" the termination.

Copsey's complaint itself fails to offer any facts which would justify a finding that a conspiracy existed; it contains only naked, conclusional allegations. The defendants said as much in their motion for summary judgment and the district court agreed with them: "[T]he allegations made in the complaint regarding an alleged conspiracy are vague and conclusory. No specific facts are alleged which actually indicate that anyone conspired with anyone else about anything." *Copsey I*, 762 F.Supp. at 1260. Copsey's opposition to the motion for summary judgment, however, does attempt to flesh out the alleged conspiracy. To survive summary

22

judgment, it was Copsey's burden at that point to cite specific evidence in the record which would create a genuine issue for trial, such that a rational fact-finder could return a verdict in his favor. *See Anderson v. Liberty Lobby, Inc.*, 106 S.Ct. 2505 (1986); *Matsushita Electric Indus. Co. v. Zenith*, 106 S.Ct. 1348 (1986). With this standard in mind, we examine the evidence cited in Copsey's summary judgment opposition.[9]

We begin by noting that Swearingen testified at his deposition that he acted alone in his decision to revoke Copsey's license and that all other defendants submitted affidavits denying that they participated in any conspiracy. Copsey must therefore have evidence which could lead a reasonable jury to believe otherwise. Reichert stated in his deposition that he and Dicharry delivered the first letter of September 10, 1987, in which Swearingen revoked Copsey's license, and that the two read over the second September 10th letter outlining the reasons for the revocation. Swearingen also said in his deposition that the two men read the letter and approved of its contents. This evidence does not establish a conspiracy on the part of Reichert and Dicharry (the latter of whom is in any event deceased and no longer a party, see note 2, *supra*). These two were Swearingen's subordinates and may have helped

---

[9]    Copsey's brief on appeal utilizes more evidence than his opposition to the motion for summary judgment or brief in support thereof. The district court was under no obligation to consider evidence that Copsey did not bring forth in opposition to the motion for summary judgment. Therefore, we will consider only that evidence which Copsey marshalled in opposition to the motion for summary judgment. *See Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909 (5th Cir. 1992).

Swearingen carry out the revocation, but this evidence does not establish that they were actually involved in the *decision* to revoke Copsey's license. Indeed, Copsey's complaint does not so allege.

Copsey's evidence against Stockman is a memo written by Schwing to his file in which Schwing says that he "suggested that he [Stockman] try to get Carey [Copsey] to curtail his trying to contact individual people in the building to enlist their support." This evidence does not prove a conspiracy between Stockman and Schwing, let alone Stockman and Swearingen. That Schwing may have suggested that Stockman urge Copsey to curtail his "campaign" is not evidence of the charged conspiracy.

The evidence that Nunez and Alario conspired with Swearingen comes from an affidavit executed by Copsey.

> "On September 9, 1987, I was required to meet Mr. Jerry Swearingen at his office. Mr. Swearingen wanted to have a discussion with me alone. At this meeting, I was given two options; either to transfer to another stand, or to be terminated. The reason I was given these options was because individuals were complaining about me at the State Capitol. When I insisted on being told who these individuals were, Mr. Swearingen stated he would not tell me. I then asked 'It was Senator Nunez and Representative Alario, wasn't it?' He then replied 'yes,' but stated he would deny this if ever asked."

Swearingen testified at his deposition that it was his "perception" that Nunez and Alario wished Copsey removed and that this was an "inference" he had picked up from Duke. However, Swearingen denied having made the statement alleged by Copsey and said further that he was not pressured by anyone into making the decision to revoke Copsey's license, that the decision was his alone. Swearingen's deposition, in our view, fails to establish a conspiracy because he

24

states only that he perceived that Nunez and Alario wanted Copsey removed and that no pressure was brought to bear upon him. Copsey's affidavit, while more incriminating, could not provide the basis for a jury verdict that Nunez and Alario conspired with Swearingen because, even though it would be admissible at trial against Swearingen as the statement of a party opponent, it would not be admissible against Nunez and Alario. Assuming that Swearingen's statement is the statement of one conspirator about his co-conspirators, it would be admissible only if made in furtherance of the conspiracy, which it plainly was not. *See* FED. R. EVID. 801(d)(2)(E). Nor would it be admissible against Nunez and Alario as a statement against interest, because the declarant (Swearingen) is available. *See* FED. R. EVID. 804(b)(3).

In sum, the district court properly granted summary judgment dismissing Copsey's conspiracy claims.

V. Copsey's Motion to Join an Additional Defendant.

On May 15, 1990, Copsey filed a motion to join Michael Baer, III, as a defendant pursuant to Federal Rules 19 and 20. The district court denied this motion when it ruled upon the defendants' motion for summary judgment. *See Copsey I*, 762 F. Supp. at 1252. The court committed no error in doing so. Because of the one-year statute of limitations applicable to this suit, Copsey cannot complain of any act committed by Baer prior to May 15, 1989. But by no later than late February 1988, Copsey was relicensed, reinstated, financially compensated, and taken off probation. Any conceivable wrong that Baer could have committed was therefore more than a year before Copsey's attempt to join him

25

as a defendant.[10]

VI. Copsey's Motion for Reconsideration.

Following the district court's grant of summary judgment to defendants on April 23, 1991, Copsey moved for reconsideration on the ground of newly discovered evidence. The district court denied the motion on June 5, 1991, ruling that Copsey's evidence "is neither newly discovered nor relevant as to any issues in this action." Copsey himself admits that the evidence in question was in his possession four weeks before the district court ruled on the summary judgment motion. The only explanation that Copsey offers for his failure to bring the evidence to the court's attention during the pendency of the summary judgment motion is that he thought the court already had more than enough evidence to rule in his favor. The district court did not abuse its discretion in denying the motion. *See Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 173-175 (5th Cir. 1990).[11]

## Conclusion

For the foregoing reasons, the judgment of the district court is

---

[10] Also, Copsey's motion, which was filed more than twenty months after the initiation of this lawsuit and just two days before the defendants filed their motion for summary judgment, was less than timely.

[11] Copsey's complaints of evidentiary rulings at the jury trial present no reversible error. The admission of his letter to the National Federation of the Blind, from which his wife read at trial, was obviously not an abuse of discretion. The exclusion at trial of two other writings was, if error at all, not prejudicial, as they were not relevant to the basis on which the directed verdict was granted. In any event, we have set the directed verdict aside.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.