UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 93-5149
_____


JIMMY BLACKBURN,

                              Plaintiff-Appellant,

                    versus

    MARSHALL CITY OF, ET AL.,

                              Defendants-Appellees.

_____

    Appeal from the United States District Court for the
              Eastern District of Texas
_____

                  (January 12, 1995)

Before GARWOOD, JOLLY and SMITH, Circuit Judges.

GARWOOD, Circuit Judge:

     Plaintiff-appellant Jimmy Blackburn (Blackburn) sued the City
of Marshall, Texas (the City), Marshall Chief of Police Chuck
Williams (Williams), and former Harrison County Sheriff Bill Oldham
(Oldham) (collectively Defendants), asserting constitutional and
state law claims arising from the revocation of his permission to
use the police radio frequency in his towing and wrecker service
business.  Blackburn appeals the district court's dismissal of his
suit for failure to state a claim under Federal Rule of Civil
Procedure 12(b)(6).  We affirm in part and reverse and remand in

part.

**Facts and Proceedings Below**

Blackburn owns and operates a towing and wrecker service in Harrison County, Texas. The backdrop of this suit centers around the wrecker business in Marshall, Texas, the county seat of Harrison County. The City provides local towing and wrecker operators with two distinct sources of business. The first category is the removal of abandoned vehicles from public property, for which the City awards a competitive contract to one local wrecker service. The second source is the removal of cars that have been involved in accidents, for which the City employs a rotating on-call system. Both these distinct operations are involved in this suit. A third source of business for local wreckers, independent of any City involvement or regulation, consists of customer requests for the assistance of a specific wrecker.

To award the contract for the removal of abandoned vehicles, the City solicited bids from local wreckers through the publication of two notices in the local newspaper as required by Texas law. TEX. LOCAL GOV'T CODE ANN. § 252.0411 (Vernon 1988). Blackburn, who does not subscribe to the newspaper, did not see the notices and therefore did not participate in the bidding process. Upset about missing the opportunity to bid, Blackburn, on or about January 23, 1992, telephoned Williams to complain about this bidding procedure. In this conversation, Williams told Blackburn that his attitude in complaining about the bidding procedure was improper and that he would therefore be removed from the rotation list for the accident

2

vehicles.  Later that day, Williams revoked Blackburn's permission to use the police radio frequency.  On January 24, Blackburn received a letter from Oldham informing him that his wrecker company had been removed from the Harrison County rotation list. In a January 26, 1992, article in the local newspaper, Williams repeated his earlier statement:  "I removed (Blackburn) [from the rotation list] because of his attitude.  I don't need him representing the city of Marshall."  This is the only adverse statement about Blackburn in the article, a copy of which is appended to the complaint.

The city police, the county sheriff, and the Texas Department of Public Safety often require the assistance of wreckers to remove damaged vehicles from accident scenes.  In an effort to ensure equitable distribution of this official wrecker business, a group of local wreckers formed the Harrison County Wreckers Association (the Association).  The Association notifies the city police, the county sheriff, and the Texas Department of Public Safety which wrecker service is available on call to receive requests for towing from the police dispatcher.  It is not alleged that Defendants participate in the administration of the Association or play any role in the Association's selection of the on-call wrecker. Unless an accident victim requests a specific wrecker, the on-call wrecker tows all vehicles involved in traffic accidents.  The Association requires, as a prerequisite for membership, permission to use the official police radio frequency.  As a result of the City's suspension of his police radio frequency privileges, Blackburn could no longer be an Association member and therefore could not

3

participate in the rotation system for removing accident vehicles.

After unsuccessfully attempting to settle his dispute with various city officials, including Williams and the mayor, and with Oldham, Blackburn requested a hearing to challenge the suspension of his radio privileges and his concomitant removal from the rotation list. Although Blackburn's pleadings are inconsistent on whether he received a hearing,[1] his brief on appeal suggests that he did receive a hearing. Blackburn also alleges that, on or about October 6, 1992, he was informed for the first time that his permission to use the police radio frequency was revoked because of information retrieved from the National Law Enforcement Computer Network (NCIC) indicating that he had a 1980 grand larceny conviction in Virginia. Blackburn denied this assertion and presented an affidavit of a Virginia court administrator stating that he did not have a grand larceny conviction.[2]

Blackburn complains that he has suffered substantial business losses as a result of Defendants' actions. In addition to losing the business generated by the on-call rotation system, Blackburn asserts that many of his customers have ceased to use his services

---

[1] In paragraph 36 of his complaint, Blackburn states both that he received a hearing and that he did not.

[2] Blackburn's complaint does not describe the circumstances surrounding this October 6 notice in any meaningful manner. Blackburn never states who informed him or how he came to learn of this newly discovered reason for the suspension of his radio privileges or whether (or, if so, how) this reason was ever memorialized. Nor does he allege that any defendant made or caused to be made any public statement concerning this Virginia conviction. Rather, the complaint merely states that "[p]laintiff was informed that the NCIC computer had revealed that Blackburn had been convicted of grand larceny in the State of Virginia in 1980."

4

in the wake of the publication of the January 26 newspaper article. Blackburn filed this suit against Defendants, pursuant to 42 U.S.C. § 1983, alleging that he was denied business referrals from the City and County in retaliation for his speech on a matter of public concern in violation of the First Amendment, and that Defendants' actions deprived him of both a liberty and a property interest without due process in violation of the Fourteenth Amendment.[3] Blackburn also asserts several pendent (or supplemental) state law claims for defamation and tortious interference with business relationships.

After filing an answer, the City and Williams moved to dismiss the complaint for failure to state a cause of action under Federal Rule of Civil Procedure 12(b)(6). Oldham separately moved to dismiss on the same ground. Oldham and Williams also asserted qualified immunity defenses. The district court granted Defendants' motions to dismiss under Rule 12(b)(6). The district court held that Blackburn's First Amendment claim failed because he was not a public employee. Rejecting Blackburn's due process claims, the district court held that the facts alleged failed to satisfy the stigmatization requirement and that he did not have a property interest in remaining on the on-call rotation list. Having dismissed all the federal claims, the district court dismissed the pendent (or supplemental) state law claims.

---

[3]    Although Blackburn's complaint included a Fourth Amendment claim, he abandoned this claim below. Blackburn also alleges that Defendants' actions violated the Fifth Amendment. Because the due process component of the Fifth Amendment applies only to federal actors, we will analyze Blackburn's claim under the Fourteenth Amendment.

Blackburn now appeals. We affirm the dismissal of Blackburn's due process claims against all three defendants, affirm the dismissal of all other claims against Oldham, and reverse the dismissal of the First Amendment claim, and the pendent (or supplemental) state law claims, against the City and Williams.

**Discussion**

I. Standard of Review

We review *de novo* a district court's dismissal for failure to state a claim under Rule 12(b)(6). *Leffall v. Dallas Independent School Dist.*, 28 F.3d 521, 524 (5th Cir. 1994). We must accept plaintiff's factual allegations as true. *Cinel v. Connick*, 15 F.3d 1338, 1341 (5th Cir.), *cert. denied*, 115 S.Ct. 189 (1994). A Rule 12(b)(6) dismissal will not be affirmed "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 78 S.Ct. 99, 102 (1957); *see also Mitchell v. McBryde*, 944 F.2d 229, 230 (5th Cir. 1991). However, "[d]ismissal is proper if the complaint lacks an allegation regarding a required element necessary to obtain relief." 2A *Moore's Federal Practice* ¶ 12.07 [2.-5] at 12-91 (footnote omitted). And, "conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." *Fernandez-Montes v. Allied Pilots Ass'n*, 987 F.2d 278, 284 (5th Cir. 1993).

In considering a defendant's claim of qualified immunity, our first inquiry is whether the plaintiff alleged "the violation of a clearly established constitutional right." *Siegert v. Gilley*, 111 S.Ct. 1789, 1793 (1991). The second inquiry is whether the

6

defendant is entitled to qualified immunity.  *Id.*  State officials are shielded from liability under qualified immunity unless they violate a constitutional right that was clearly established at the time of their conduct.  *Pfannstiel v. Marion*, 918 F.2d 1178, 1183 (5th Cir. 1990).

II.  First Amendment Claim

Blackburn argues that Defendants' revocation of his permission to use the police radio frequency was in retaliation for the exercise of his First Amendment right to free speech.  According to Blackburn's complaint, he spoke out on a matter of public concern: the bidding procedure for the abandoned vehicles contract. Blackburn alleges that, as a result, the City revoked his permission to use the police radio frequency, thereby rendering him ineligible for continued membership in the Association and participation in its rotation list.  The district court rejected Blackburn's First Amendment claim on the basis that he was not a public employee and thus was not entitled to protection against retaliation for speaking out on a matter of public concern.

At the outset, we reject the district court's apparent assumption that only public employees enjoy the protections of the First Amendment.  The district court's reasoning is inverted. Every citizen enjoys the First Amendment's protections against governmental interference with free speech, but the First Amendment rights of public employees are restricted by the nature of the employer-employee relationship.

It is well established that "even though a person has no `right' to a valuable government benefit and even though the

7

government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interestsSQespecially, his interest in freedom of speech." *Perry v. Sindermann*, 92 S.Ct. 2694, 2697 (1972). Because of the special nature of the relationship between an employer and its employees, the Supreme Court has recognized that "the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." *Pickering v. Board of Education*, 88 S.Ct. 1731, 1734 (1968); *see also Connick v. Myers*, 103 S.Ct. 1684 (1983). For this reason, the First Amendment rights accorded public employees are governed by the two-prong test announced in *Pickering* and *Connick*. Under this test, a public employee alleging a First Amendment violation on the ground that he has been discharged for his speech must first establish that his speech may be "fairly characterized as constituting speech on a matter of public concern." *Connick*, 103 S.Ct. at 1690. The second prong teaches that there is a First Amendment violation only if the employee's interest in speaking outweighs "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering*, 88 S.Ct. at 1734-35.

Having concluded that Blackburn was not a public employee, the district court held that he was not entitled to First Amendment "protection against retaliatory discharge for speaking out on

8

matters of public concern." Although we agree Blackburn was not a public employee, that fact alone cannot end a court's First Amendment analysis. Outside the somewhat expanded context of public employment under *Pickering* and *Connick*, a court generally examines a free speech claim under the more First Amendment friendly standard enunciated in *Perry*. 88 S.Ct. at 2697. Accordingly, the district court erred in dismissing Blackburn's free speech claim on the ground that he was not a public employee. Because of the public concern requirement in the public employee line of cases, a court's determination of whether to apply the *Pickering/Connick* standard or the broader protections of *Perry* may have a determinative effect on a plaintiff's First Amendment claim. *See, e.g., Havekost v. United States Dep't of the Navy*, 925 F.2d 316, 318 (9th Cir. 1991) ("Because protected speech must address a matter of public concern in the *Pickering/Connick* cases, an employee may have a steeper hurdle than a *Perry* plaintiff.").

Without question, a public employee discharged for speech-related activity triggers the *Pickering/Connick* analysis. The more problematic inquiry is whether a plaintiff such as Blackburn is a public employee for First Amendment purposes. Because the facts of this case do not involve a standard public employer-employee relationship, we first address whether to approach Blackburn's claim under *Pickering* and *Connick* or under the broader protections of *Perry*. Although the *Pickering/Connick* test arose in the context of public employment, courts have not strictly cabined its application. In general, courts have invoked two reasons for applying the test outside of the employment context: that the

9

relationship involved was analogous to an employer-employee relationship and that the principle underlying *Connick* warranted its application. Applying these two justifications to the present case, we conclude that the record before us does not demonstrate that Blackburn's relationship with the City was such as to warrant extending the public employee standard to his instant First Amendment claim.

Courts have extended the *Pickering/Connick* analysis to cases involving relationships analogous to an employment relationship. For example, in *Smith v. Cleburne County Hosp.*, 870 F.2d 1375 (8th Cir.), *cert. denied*, 110 S.Ct. 142 (1989), a doctor filed suit against a public hospital alleging that it terminated his staff privileges in retaliation for his speech in violation of the First Amendment. The Eighth Circuit recognized that the doctor was not a salaried public employee but nonetheless applied *Pickering* and *Connick*, reasoning that the doctor's relationship with the state contained sufficient indicia of a public employment relationship. The Court explained:

> "While there is not a direct salaried employment relationship, there is an association between the independent contractor doctor and the Hospital that [has] similarities to that of an employer-employee relationship. For instance, there is an application process for privileges, there are required duties to be performed by both parties, and there are potential liabilities each party is responsible for jointly and severally for tortious conduct. As a result of these similarities, the application of the *Pickering* balance test and its progeny in this case is appropriate." *Id.* at 1381.

*See also Caine v. Hardy*, 943 F.2d 1406, 1415-16 (5th Cir. 1991) (en banc), *cert. denied*, 112 S.Ct. 1474 (1992) (applying the

10

*Pickering/Connick* analysis to the First Amendment claim of an anesthesiologist who lost his clinical privileges at a public hospital); *Davis v. West Community Hospital*, 755 F.2d 455, 461 (5th Cir. 1985) (using *Pickering/Connick* test to evaluate free speech claim of a surgeon whose staff privileges were suspended by a public hospital).

We conclude that the relationship between Blackburn and Defendants does not rise to the level of even a quasi-employment relationship like that in the medical staff privileges cases. Accordingly, we hold that the facts of this case are not sufficiently analogous to the employment cases to warrant the direct and full application of *Pickering* and *Connick*.

We now consider whether the rationale underlying *Connick* nevertheless warrants the application of the public employee standard in this case. In *Connick*, the plaintiff, upset about an impending transfer, circulated a questionnaire concerning office morale, the need for a grievance committee, internal office procedures regarding transfers, and various other work-related complaints. 103 S.Ct 1684. After losing her job in the wake of distributing the questionnaire, the plaintiff filed suit, alleging that the termination violated her First Amendment rights. Rejecting the First Amendment claim, the Court stated that "a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." *Id* at 1690. As the Court explained, "[I]t would indeed be a Pyrrhic victory for the great principles of free expression if the Amendment's safeguarding of a

11

public employee's right, as a citizen, to participate in discussions concerning public affairs were confused with the attempt to constitutionalize the employee grievance that we see presented here." *Id.* at 1694. Thus, the Court in *Connick* recognized that a public employer enjoys wide latitude in the administration of its own affairs and underscored a reluctance to convert every workplace grievance into a constitutional claim.

In *Havekost v. United States Dep't of the Navy*, 925 F.2d 316 (9th Cir. 1991), the plaintiff, a grocery bagger licensed to work at a military installation, alleged that the Navy terminated her license in retaliation for her speech. Recognizing that Havekost was a licensee rather than a salaried public employee, the Ninth Circuit stated that *Pickering* and *Connick* "are not directly on point." *Id.* at 318. Nevertheless, the court held that the principle enunciated in *Connick* mandated the application of the public employee standard to Havekost's First Amendment claim: "Because Havekost's dispute, like that of the plaintiff in *Connick*, *is nothing more than a workplace grievance*, ruling for her would be inconsistent with the principle stated in *Connick*." *Id.* (emphasis added).

In *Copsey v. Swearingen*, 36 F.3d 1336 (5th Cir. 1994), the plaintiff, Copsey, operated a "blind" vending stand in the Louisiana state capitol under a license from a state agency. Copsey alleged that his First Amendment rights were violated by the termination of his license on account of his complaints about the licensing program, and asserted that the *Pickering/Connick* test should not apply because he was not a state employee. We responded

to this contention by stating "[w]e cannot entirely agree with Copsey that the *Pickering/Connick* test finds no application in this context." *Id*. at 1344. Examining the relationship between the licensee and the agency,[4] we concluded that "Copsey was more like a public employee than an ordinary citizen, and therefore . . . *Pickering* and *Connick* have relevance to this situation." *Id*. In holding that certain portions of Copsey's speech were sufficiently on matters of public concern to be protected under the First Amendment, we stated that although these portions "might impact his own situation," they "would impact aspects of it that were not those which are analogous to the employee-employer relationship. Even though we have held that the *Pickering/Connick* test is relevant to Copsey's claim, we remain mindful that it is indisputably clear that he was *not* an employee, but was only in a situation partly analogous thereto." *Id*. at 1346.

While we in *Copsey* and the Ninth Circuit in *Havekost* were able to analogize the relationship between the plaintiff and defendant to that of employee-employer, plainly any such analogy is vastly

---

[4]    We stated that the agency rules governing the blind vendors under the licensing program "bear the mark of an employment-type relationship." *Id*. We went on to note that:

> "After being selected, vendors are trained by the state. The vendors are issued their licenses for an indefinite term, but may be suspended or terminated for noncompliance with program rules and regulations . . . . The actual vending space is owned by the state; the state furnishes vendors with such substantial equipment as refrigerators, microwave ovens, and cash registers. The vendor must maintain this equipment, but the state is responsible for making repairs. The vendor is provided with an initial inventory, title to which remains with the state, and he must replace the inventory upon his resignation." *Id*.

13

weaker in the present case. Moreover, Blackburn's complaint grounds his free speech claim on his telephone conversation with Williams in which he alleges he complained about the public bidding procedure for the abandoned vehicles contract. In retaliation for this speech concerning the public bidding process, Williams allegedly revoked Blackburn's permission to use the police radio frequency. Thus Blackburn's speech did not relate to the relationship from which he was terminated, and his speech cannot be equated to the workplace grievances in *Connick* and *Havekost*. Because Blackburn's relationship with Defendants is not sufficiently analogous to the public employment relationship, and because his speech is not a work-related grievance, we hold that under clearly established law Blackburn's First Amendment claim should be analyzed pursuant to *Perry* rather than *Connick*.

Under *Perry*, the government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interest[] . . . in freedom of speech." *Perry*, 92 S.Ct. at 2697. In *North Mississippi Communications, Inc. v. Jones*, 792 F.2d 1330 (5th Cir. 1986), the *North Mississippi Times* published editorials and news stories criticizing several members of the county board of supervisors. As a result, the county ceased advertising in the *Times* and threatened other advertisers with a loss of county business unless they withdrew their advertisements from the *Times*. The *Times* sued the county alleging that the withdrawal of county advertising and the threats to other *Times* advertisers constituted retaliation for its speech in violation of its First Amendment rights. Reversing the district court's directed verdict for the

14

defendants, this Court applied the *Perry* holding:

> "Although the *Times* may have had no right to receive certain legal advertising from the County Board of Supervisors, it would violate the Constitution for the Board to withhold public patronage, in the form of its advertising, from the *Times* in retaliation for that newspaper's exercise of first amendment rights . . . . To permit such actions would allow the government to produce a result which [it] could not command directly, that is, denying the *Times* business in retaliation for its protected speech." *Id.* at 1337 (citation and internal quotation marks omitted).[5]

Having determined that the district court erred in failing to adjudicate Blackburn's free speech claim under *Perry*, we consider the propriety of its dismissal of Blackburn's claim against all three defendants.

As to Oldham, the complaint does not allege any First Amendment violation by him, or that he did anything in retaliation for any speech by Blackburn.[6] The district court did not err in dismissing as to Oldham the complaint's First Amendment claims. As to Williams, we hold that for purposes of a Rule 12(b)(6) motion

---

[5] In *Abercrombie v. City of Catoosa, Okla.*, 896 F.2d 1228 (10th Cir. 1990), the Tenth Circuit analyzed a First Amendment claim asserted by a wrecker who was removed from a rotation list after testifying against the city in a federal trial and campaigning against the mayor. Reversing the district court's grant of judgment notwithstanding the verdict on the plaintiff's First Amendment claim, the Court applied *Perry* and reinstated the jury verdict on the First Amendment claim.

[6] We also observe that Blackburn's detailed response to Oldham's motion to dismiss asserted only that Oldham violated Blackburn's due process rights to "his liberty and property interests in his business without giving him notice or the opportunity to be heard"; it said nothing about the First Amendment, free speech, or retaliation. In contrast, Blackburn's response to the motion to dismiss of Williams and the City specifically asserted that "the actions by the City and Defendant Williams were retaliatory actions in response to Blackburn's free speech on a public issue."

15

the complaint sufficiently alleges that Williams violated Blackburn's First Amendment rights and that any reasonable official in Williams' position should have so realized. *See Copsey; North Mississippi*. As to the City, though the complaint is considerably less precise than it should be, and the question presented is a close one, we ultimately conclude that for Rule 12(b)(6) purposes it sufficiently alleged a violation, or at least ratification, by the City's policymakers.[7]

Accordingly, we reverse the district court's dismissal of the First Amendment claims as to the City and Williams, but affirm as to Oldham.

III. Due Process Claims

In a section 1983 cause of action asserting a due process violation, a plaintiff must first identify a life, liberty, or property interest protected by the Fourteenth Amendment and then identify a state action that resulted in a deprivation of that interest. *San Jacinto Sav. & Loan v. Kacal*, 928 F.2d 697, 700 (5th Cir. 1991); *see also Board of Regents v. Roth*, 92 S.Ct. 2701, 2705 (1972). Blackburn's complaint alleges that Defendants' actions

---

[7]    The complaint expressly alleged City liability on the basis of, *inter alia*, ratification. *See City of St. Louis v. Praprotnik*, 108 S.Ct. 915, 926 (1988) ("If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality"). We do not suggest that the complaint is not in this respect subject to proper motion under Fed. R. Civ. P. 6(e) or that if clarified it would not be subject to a Rule 12(b)(6) motion or a motion for summary judgment by the City, either as respects ratification or as to whether the officials in question were policymakers in the relevant sense. *See Jett v. Dallas ISD*, 7 F.3d 1241 (5th Cir. 1993).

Nor do we suggest that Williams will not be entitled to summary judgment.

16

deprived him of protected liberty and property interests without due process of law.

A.   Stigma Claim

Blackburn alleges that Williams' statement in the newspaper stigmatized him and damaged his reputation in the community, thereby depriving him of a protected liberty interest.[8]  In *Paul v. Davis*, 96 S.Ct. 1155, 1165 (1976), the Supreme Court held that the infliction of a stigma on a person's reputation by a state official, without more, does not infringe upon a protected liberty interest.  As the Court in *Paul* stated, there is "no constitutional doctrine converting every defamation by a public official into a deprivation of liberty within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment."  *Id.* at 1161.

We have applied the holding of *Paul* by requiring a section

---

[8]   The complaint alleges:

"On or about January 24, 1992, Defendant Williams was interviewed by the local Marshall newspaper and affirmed that Plaintiff Blackburn had been removed from the rotation list due to Blackburn's 'attitude.' Defendant Williams further stated in the interview that the City of Marshall did not want people like Blackburn working for the City of Marshall.  See Exhibit 'A.'

Plaintiff Blackburn's business immediately began suffering huge losses.  Blackburn's wreckers were no longer called to provide services for the City of Marshall and after the publication of the newspaper article many local business which had utilized Blackburn's services in the past refused to do business with Blackburn and cited the negative comments of the Police Chief concerning Blackburn which had been printed in the local newspaper."

The complaint also asserts that "Plaintiff was deprived of a liberty interest, Plaintiff's good name and reputation, without a chance for a name clearing hearing due to Defendant Williams' publication of defamatory material concerning the Plaintiff."

17

1983 plaintiff to show stigma plus an infringement of some other interest. *Kacal*, 928 F.2d at 701. To satisfy the stigma prong of this test, "the plaintiff must prove that the stigma was caused by a *false* communication." *Phillips v. Vandygriff*, 711 F.2d 1217, 1221 (5th Cir. 1983) (citing *Codd v. Velger*, 97 S.Ct. 882 (1977)). Moreover, we have found sufficient stigma only where a state actor has made concrete, *false* assertions of *wrongdoing on the part of the plaintiff*. *Kacal*, 928 F.2d at 701.

It is evident that the allegations of Blackburn's complaint fail to state a claim for the deprivation of a liberty interest in this respect. As a threshold matter, Blackburn cannot maintain his liberty interest claim against Oldham because his complaint does not allege that Oldham made (or caused to be made) any statement at all. As far as the remaining defendants are concerned, the allegations in Blackburn's complaint concerning Williams' statement to the newspaper do not meet the stigma requirement. Because Blackburn has grounded his liberty interest claim solely on Williams' statement to the newspaper, it must fail. In *Connelly v. Comptroller of the Currency*, 876 F.2d 1209, 1215 (5th Cir. 1989), the plaintiff based his reputational due process claim on the defendant's statement that, "We are of the opinion that Mr. Connelly does not possess the qualifications for the position . . . ." Rejecting this claim under the stigma-plus-infringement test, we held that "[t]he opinion of the [defendant] contains no false factual representations, concrete or otherwise." *Id.* In *Wells v. Hico ISD*, 736 F.2d 243 (5th Cir. 1984), *cert. denied*, 106 S.Ct. 11 (1985), we observed that "[t]he charges must be false" *and* that

18

"for a charge to be stigmatizing it must be worse than merely adverse; it must be such as would give rise to 'a "badge of infamy," public scorn, or the like.'" *Id*. at 256 & n.16. Williams' statement voicing his opinion about Blackburn's attitude does not constitute a false factual representation. Indeed, Blackburn has made no allegation that Williams' statement is false, a prerequisite for a liberty interest-stigma claim. *See Codd*, 97 S.Ct. at 884; *Connelly*. Further, the statement does not accuse Blackburn of any wrongdoing. It simply is not stigmatizing. *Wells* at 256 & n.16.[9] Accordingly, we hold that Blackburn has failed to meet the stigma requirement of the stigma-plus-infringement test, and therefore the district court properly dismissed his liberty interest-stigma claim.[10]

B. Right to Engage in a Calling Claim

Blackburn also argues that he had a property interest in remaining on the on-call list, and that Defendants' actions

---

[9] We are unpersuaded that Williams's statement concerning Blackburn's attitude rises to the level of public accusations of lying on a job application, *see White v. Thomas*, 660 F.2d 680 (5th Cir. 1981), *cert. denied*, 102 S.Ct. 1731 (1982), or falsifying travel vouchers, *see Robinson v. Wichita Falls & North Texas Community Action Corp.*, 507 F.2d 245, 252 (5th Cir. 1975).

[10] Although Blackburn's complaint alleges that the October 6 statement concerning the Virginia felony conviction was false, he never states which, if any, defendant made the statement. Moreover, he never alleges that this statement was made public or that any defendant made it public. A prerequisite to raising a liberty interest claim based on stigma is that the statement be made public by the defendant. *Arrington v. County of Dallas*, 970 F.2d 1441, 1447 & n.4 (5th Cir. 1992); *Huffstutler v. Bergland*, 607 F.2d 1090, 1092 (5th Cir. 1979). *See also, e.g., Bishop v. Wood*, 96 S.Ct. 2074, 2079 (1976). Accordingly, this alleged statement cannot form the basis for Blackburn's liberty interest claim.

19

deprived him of this interest without due process.[11]  In order for a person to have a property interest within the ambit of the Fourteenth Amendment, he "must have more than an abstract need or desire for it.  He must have more than a unilateral expectation of it.  He must, instead, have a legitimate claim of entitlement to it."  *Board of Regents v. Roth*, 92 S.Ct. 2701, 2709 (1972).  Property interests are not created by the Constitution; rather, they stem from independent sources such as state statutes, local ordinances, existing rules, contractual provisions, or mutually explicit understandings.  *Perry*, 92 S.Ct. at 2699-2700.  However, it is clear that "the sufficiency of the claim of entitlement must be decided by reference to state law."  *Bishop v. Wood*, 96 S.Ct. 2074, 2077 (1976) (footnote omitted).  *See also Logan v. Zimmerman Brush Co.*, 102 S.Ct. 1148, 1155 (1982) ("The hallmark of property . . . is an individual entitlement grounded in state law, which cannot be removed except 'for cause'"); *Wells* at 252 (same); *Henderson v. Sotelo*, 761 F.2d 1093, 1096 (5th Cir. 1985); *Williams v. Texas Tech Univ. Health Sciences Ctr.*, 6 F.3d 290, 293 (5th Cir. 1993), *cert. denied*, 114 S.Ct. 1301 (1994).[12]

---

[11]    The complaint alleges "Plaintiff was deprived of property which was a source of income and revenue to him, namely the ability to tow and store cars for the City of Marshall and Harrison County and to utilize the radio network without notice, without a chance for appeal."

[12]    We do not suggest that federal lawSQsuch as a federal statute or the likeSQcould not create a property interest.  *Cf*. *Mathews v. Eldridge*, 96 S.Ct. 893 (1976).  The point is simply that the Constitution itself does not create such interests. Some other applicable substantive law must establish the claim of entitlement and prevent its removal except for substantive cause. No federal statute or regulation or the like is claimed to grant a relevant entitlement here.

20

Blackburn cites, and we have found, no decision of any Texas court indicating that he had any entitlement to be or remain on the on-call rotation list. Nor does he cite, and we have not found, any Texas statute or administrative regulation, or any ordinance of the City or Harrison County, which might be construed to provide such an entitlement.

Several courts have addressed the issue of whether a wrecker has a protected interest in remaining on an on-call rotation list. Because the teachings of the Supreme Court direct us to determine the existence of a protected property interest based on state law, local ordinances, contracts, and mutually explicit understandings, we cannot distill a specific rule from these wrecker cases to govern all cases involving a person's removal from a rotation list. Instead, we must examine the facts of the case before us and determine whether Blackburn has asserted a legitimate, constitutionally protected claim of entitlement to remain on the rotation list, or whether he has merely alleged a unilateral expectation of receiving government referrals. Nevertheless, the wrecker cases, as well as other cases addressing property interest claims, guide our analysis.

Blackburn relies on *Cowan v. Corley*, 814 F.2d 223 (5th Cir. 1987), to support his argument that he has a protected interest in remaining on the on-call list. In *Cowan*, the plaintiff operated a wrecker service in Montgomery County, Texas. The county sheriff formed the Montgomery County Wrecker Association and issued a detailed list of requirements for participation. After joining the association and paying the initiation fees and requisite dues,

21

Cowan lodged a complaint with the sheriff alleging preferential treatment in the assignment process. Cowan alleged that as a result of his complaint he was expelled from the association without warning. He sued the sheriff and others, asserting a section 1983 due process claim contending that the defendants' actions deprived him of the opportunity to engage in his calling. The district court dismissed Cowan's section 1983 claim under Rule 12(b)(6). On appeal, this Court reversed, finding that Cowan had sufficiently asserted a protected liberty or property interest in pursuing his livelihood to preclude Rule 12(b)(6) dismissal. *Id.* at 228.[13]

Despite Blackburn's argument that the facts of *Cowan* and the instant case are analogous, we find *Cowan* distinguishable. First,

---

[13] There we noted that the district court had observed:

"that Cowan had not asserted a liberty interest violation. Although the pleadings claim a property interest violation, the factual allegations upon which the categorization is based directly relate to both property and liberty interests. The essence of Cowan's complaint is that he has been denied the opportunity to pursue his livelihood. That is a constitutionally protected interest." *Id*. at 227.

*Cowan* then cited and quoted at length from *Phillips v. Vandygriff*, 711 F.2d 1217, 1222 (5th Cir. 1983), which we consider in detail in the text, *infra*. *Cowan* then concludes by stating:

"As our holding in *Phillips* makes clear, the right to engage in the occupation of one's preference is not absolute. Within the strictures of due process both property and liberty interests may be constrained. Ultimately, that may prove to be the situation in the matter now before us. On that we express no opinion. But dismissal at this stage on the basis of Fed. R. Civ. P. 12(b)(6) was error." *Id*. at 228 (footnote omitted).

22

the sheriff in *Cowan* organized and ran the county association. In the present case, there is no allegation that the sheriff, the City, or Williams played such a substantial role in the administration of the association. Second, under the requirements issued by the sheriff in *Cowan*, as we construed them, "only members of the . . . association would be permitted to tow vehicles from public property," and, in addition, "[a]ll wrecker assignments, *including those made on an owner-preference basis* were routed through the sheriff's office and the association's dispatcher." *Id.* at 225 (emphasis added). By contrast, there is no allegation in the present case that all business had to be routed through the sheriff and the association. Nothing prevented Blackburn from responding to specific customer calls for assistance to remove wrecked vehicles from county or city streets. Cowan, however, could not under any circumstances tow *any* vehicles from public property unless he was a member of the sheriff's association. Thus, while the association formed and managed by the sheriff in *Cowan* established a comprehensive framework for managing virtually every aspect of the wrecker industry in Montgomery County, it is not alleged that the Harrison County Wreckers Association is run by the sheriff or any other government official or that its agenda goes beyond merely assuring the equitable distribution of official wrecker business among local operators. Blackburn does not allege that the revocation of his police radio privileges and his ineligibility for continued Association membership prevent him from engaging in nongovernment-generated business. Blackburn is essentially claiming a right to government referrals; Cowan, as we

23

construed it, asserted a right to do business with private individuals.

Because the rule in *Cowan* does not decide this case, we turn for guidance to the wrecker decisions of other courts. Several general principles emerge from our review of these cases. Where a court has found a property interest in remaining on a rotation list, the plaintiff has alleged a claim of entitlement supported or created by a formal and settled source such as a state statute or regulatory scheme. Absent such an entitlement grounded in state law, courts have not found a protected property interest in remaining on a wrecker rotation list.

For example, the court in *Abercrombie v. City of Catoosa, Okla.*, 896 F.2d 1228 (10th Cir. 1990), held that the plaintiff had a protected property interest in continued wrecker referrals pursuant to the Oklahoma wrecker statute. Under Oklahoma law, each police officer was required to maintain a list of licensed wreckers located in the officer's district. The court found that the provisions of the Oklahoma wrecker statute requiring the city "to make wrecker referrals on an equal basis as nearly as possible . . . created a property interest in wrecker referrals in favor of the plaintiff." *Id.* at 1232. Because Blackburn does not allege that his asserted property interest derives from a Texas statute or regulation, the holding in *Abercrombie* does not apply to the instant case.

In *Pritchett v. Alford*, 973 F.2d 307 (4th Cir. 1992), the South Carolina Department of Highways and Public Transportation promulgated extensive regulations governing the operations of

24

wrecking businesses within the state. Under these regulations, every highway patrol district was required to set up wrecker zones and maintain wrecker rotation lists for each zone. These regulations also mandated that the rotation lists be administered in an even-handed manner to ensure equal distribution of the wrecker business. After being removed from the rotation list, plaintiff filed a section 1983 action alleging a deprivation without due process of his property interest in being on the rotation list. The Court in *Pritchett* held that South Carolina's *regulatory regime* created a protected property interest in being on the on-call list rather than a mere unilateral expectation of receiving government business. *Id.* at 317. Because the Court in *Pritchett* based its holding on the existence of a state regulatory scheme, Blackburn cannot rely on that case for the general proposition that a wrecker service has a constitutionally protected right not to be summarily removed from a rotation list.

*Durham v. Jones*, 698 F.2d 1179 (11th Cir. 1983), was a section 1983 action challenging the county sheriff's refusal to place the plaintiff on the wrecker rotation list. For his convenience, the sheriff maintained a list of wrecker services that he used on a rotating basis. Under this informal arrangement, the sheriff never issued any written rules or regulations, nor did he institute a structured application process. The court in *Durham* held that the plaintiff did not have a property or liberty interest in remaining on the sheriff's informal on-call list; instead, the court stated that the plaintiff merely had "a unilateral expectation" to receive business referrals from the sheriff's department. *Id.* at 1181. In

25

reaching this conclusion, the court stressed that the sheriff's action did not affect the plaintiff's "right to operate a towing service." *Id*.[14] Likewise, Defendants' actions have not foreclosed Blackburn's right to operate a towing service in Harrison County or his ability to perform services for a nongovernment clientele.

In *Piecknick v. Commonwealth of Pennsylvania*, 36 F.3d 1250 (3d Cir. 1994), plaintiffs brought a section 1983 suit alleging a deprivation of their due process rights based on the defendants' preferential administration of a wrecker rotation list. Guidelines established by the Pennsylvania State Police required an officer in need of a wrecker to call the nearest available wrecker on a rotational basis. The court found that the police guidelines merely articulated a general policy and did not create "an enforceable contract between the towing services on the list and the State Police." *Id.* at 1256. Having found no contractual basis for a property interest, the court went on to analyze whether the

---

[14] In *Gregg v. Lawson*, 732 F.Supp. 849 (E.D. Tenn. 1989), the Court distinguished *Durham* and found that the plaintiff had a protected property interest in remaining on the on-call list. In *Gregg*, the Tennessee Department of Public Safety issued a general order to supplement its existing regulations governing the provision of wrecker services within the state. The plaintiff argued that the retroactive application of this general order deprived him of his protected property interest in remaining on the on-call list. The court held that the plaintiff had a protected property interest in remaining on the on-call list because "the *regulations in effect* prior to the revised general order clearly create an expectation that a provider will be called on a regular rotating basis." *Id.* at 853 (emphasis added).
Again, the court's finding that the plaintiff had a protected property interest in remaining on the on-call list was explicitly premised on the existence of the state regulatory scheme. Thus, the holding of *Gregg* does not apply to the facts of the instant case.

parties' mutual understanding based on past practices gave rise to a property interest. *See Perry*, 92 S.Ct. at 2699-2700. After discussing other wrecker decisions such as *Pritchett*, *Abercrombie*, and *Gregg*, the court stated: "These cases are distinguishable. In all of them, a state statute or regulation gave a towing operator a property interest. Here there is no Pennsylvania statute or regulation governing towing or wrecker services." *Piecknick* at 1257 (footnote omitted). Similarly, Blackburn has not alleged that his interest in remaining on the rotation list arises from a Texas statute or regulation. *Piecknick* likewise rejected any liberty claim. *Id*. at 1259-62.

*White Plains Towing Corp. v. Patterson*, 991 F.2d 1049 (2d Cir.), *cert. denied*, 114 S.Ct. 185 (1993), presented a situation where the state police divided a section of highway into zones and assigned each zone to one wrecker service that would have an exclusive right to referrals within the zone. Under this system, the state police dispatcher always called the wrecker assigned to the zone absent a motorist's request for a specific wrecker. The plaintiffs' section 1983 action asserted a due process claim based on the state police's termination of their exclusive towing assignment in an assigned zone. Emphasizing that this informal police assignment system was not authorized or governed by any New York statute or regulation, the court held that "regardless of their unilateral hopes or expectations, plaintiffs had no cognizable property interest in continued towing referrals . . . and the mere termination of their status thus did not deprive them

27

of a due-process-protected interest."  *Id.* at 1062.[15]

In *O'Hare Truck Serv., Inc. v. City of Northlake*, 843 F.Supp. 1231 (N.D. Ill. 1994), the plaintiff claimed a property interest in remaining on the city's rotation list.  Surveying the wrecker opinions, the court found that decisions recognizing a property interest in remaining on a rotation list all "dealt with formalized official sources of property rightsSQcreated by the relevant state law, as *Roth* teaches must be the case."  *Id.* at 1233 (citation omitted).  Dismissing the due process claim, the court held that the plaintiff had not alleged a protected property interest because of the absence of any official or formal source based in state law. *Id.*[16]

In order to prevail on his property interest claim, Blackburn must show that his interest in remaining on the rotation list is more than a unilateral expectation of continued use of the police

---

[15]    The court also based its holding on the fact that New York law presumes that a contract for services with no durational provision is terminable at will.  "An interest that state law permits to be terminated at the whim of another person is not a property right that is protected by the Due Process Clause." *Patterson*, 991 F.2d at 1062.

[16]    Blackburn also relies on an unpublished district court opinion, *Morris v. McCallie*, No. Civ. 4-91-032, 1993 WL 625544 (E.D. Tenn. May 6, 1993).  In *Morris*, the district court held that the plaintiff had a property interest in remaining on the wrecker rotation list.  Despite the absence of any written regulations or state regulatory scheme, the court found that a mutually explicit understanding between the sheriff and members of the list was sufficient to create a property interest.  In reaching this conclusion, the court stressed that the sheriff's office had administered the rotation list for twenty-five years and that the plaintiff himself had been on the rotation list for some twelve years.  In *O'Hare Truck Services*, the court rejected the holding of *Morris* as inconsistent with the other wrecker cases.  843 F.Supp. at 1233.  We agree.  We likewise reject Blackburn's argument based on *Morris*.

28

radio frequency and receipt of government referrals.  Because Blackburn does not allege that his property interest in remaining on the rotation list stems from a state statute or regulatory scheme, a contract, or any other independent source, we find that Blackburn has failed to allege a property interest protected by the Due Process Clause of the Fourteenth Amendment.

Blackburn argues that *Phillips v. Vandygriff*, 711 F.2d 1217 (5th Cir. 1983), and *San Jacinto Sav. & Loan v. Kacal*, 928 F.2d 697 (5th Cir. 1991), support his argument.  Despite Blackburn's efforts to portray the facts of this case as analogous to *Kacal* and *Phillips*, we find those two cases distinguishable.

Both *Phillips* and *Kacal* involve egregious government conduct in interfering with the plaintiff's pursuit of a private career or business; they did not involve persons asserting a liberty interest in a particular type of governmental referral to which they were not otherwise entitled under state or federal law.  In *Phillips*, the plaintiff, seeking a management position in the savings and loan industry, entered an agreement to become an executive of Sinton Savings and Loan Association (Sinton).  During this time, plaintiff Phillips and several Sinton principals met with defendant Vandygriff, the Commissioner of the Texas Savings and Loan Department.  Phillips never actually started working at Sinton because of what ultimately turned out to be severe irregularities by others at Sinton, including the misuse of funds, which led to the indictment of two Sinton principals.  Phillips continued his quest for other employment in the industry.  According to industry custom, employers would screen prospective managerial employees

29

with Vandygriff.  Although Vandygriff had no reason to suspect Phillips of any wrongdoing, he informed prospective employers of Phillips's connection with Sinton and told them that he could not recommend him for employment, as a result of which Phillips was unable to find employment anywhere in the industry.

The court in *Phillips* held there was sufficient evidence that the defendants had established a *de facto state licensing system* under which Phillips was deprived of his constitutionally protected interest in pursuing his occupation. *Id.* at 1222.  Essentially, defendant Vandygriff's de facto licensing program amounted to governmental interference that prevented Phillips from private employment anywhere in the savings and loan industry. *See, e.g., Greene v. McElroy*, 79 S.Ct. 1400, 1411 (1959) ("[T]he right to hold specific private employment and to follow a chosen profession free from unreasonable governmental interference comes within the `liberty' and `property' concepts of the Fifth Amendment . . . ."); *Truax v. Raich*, 36 S.Ct. 7, 10 (1915) ("the right to work for a living in the common occupations of the community is of the very essence of the personal freedom and opportunity that it was the purpose of the [Fourteenth] Amendment to secure").  This type of direct governmental interference with private employers who might want to develop a business relationship with Phillips is distinguishable from Defendants' revocation of Blackburn's police radio frequency privileges and his resulting removal from the rotation list.  Defendants' conduct affected only Blackburn's ability to receive government referrals.

Blackburn also relies on *Kacal* to bolster his argument that he

30

had a property interest in remaining on the on-call list. In *Kacal*, the plaintiff filed a section 1983 suit alleging that police harassment of her private customers deprived her of a constitutionally protected interest in operating a private business. 928 F.2d 697. Reversing the district court's grant of summary judgment in favor of defendants, this Court held that plaintiff's allegations that police harassment caused the failure of her arcade asserted the deprivation of a protected interest, thus precluding summary judgment. *Id.* at 704. Like *Phillips*, *Kacal* involved direct governmental interference with private persons contemplating a business relationship with the plaintiff. By contrast, the protected interest Blackburn asserts is only his unilateral expectation to use the local police radio frequency and receive local government referrals.

Because there apparently is no Texas or local statute, ordinance, or regulatory scheme governing the wrecker list operated by the Harrison County Wrecker's Association, we hold that Blackburn has failed to allege a property interest in remaining on the wrecker rotation list. Blackburn's argument is couched in terms of governmental interference with his property interest in pursuing an occupation, but upon closer examination, he is essentially claiming a right to receive a certain class of business referrals from the local government. *Cf. Piecknick* at 1259 ("[Plaintiff] has no rights as an employee of the state because he is a mere supplier of services."). We have consistently held that the mere existence of a governmental program or authority empowered to grant a particular type of benefit to one such as the plaintiff

31

does not give the plaintiff a property right, protected by the due process clause, to receive the benefit, absent some legitimate claim of *entitlement*SQarising from statute, regulation, contract, or the likeSQto the benefit. *See, e.g., Wilson v. US Dept. of Agriculture*, 991 F.2d 1211, 1216 (5th Cir. 1993); *Coghlan v. Starkey*, 845 F.2d 566, 569-70 (5th Cir. 1988); *Mahone v. Addicks Utility District*, 836 F.2d 921, 929-931 (5th Cir. 1988). This is true for a continuation of a benefit. *See Coghlan* (water service); *Wells* (employment). The result, obviously, is not to be changed merely by employing the label "liberty" instead of "property." Were that not so, the "legitimate claim of entitlement" requirement would be entirely meaningless. "The questions . . . are when and how a person acquires an 'interest in specific benefits' which will trigger the due process clause." *Mahone* at 929. Moreover, the long tradition in our nation has been that, where not affirmatively restricted by reasonable laws or regulations of general application, private individuals normally have the right to engage in private employment or any of the common occupations of life with or for those private persons who see fit to engage, patronize, or do business with them; this tradition, however, does not embrace any assumption of a right to particular government business or referrals. Blackburn has not alleged that any governmental action prevents or restricts him from doing business with those private citizens who wish to avail themselves of his services.

We hold that the facts alleged here do not give rise to any liberty or property interest protected by the Fourteenth Amendment. *Durham*. Accordingly, the district court did not err in dismissing

32

Blackburn's due process claim against all three defendants under Fed. R. Civ. P. 12(b)(6).

IV.  Pendent (or Supplemental) State Law Claims

The district court dismissed Blackburn's pendent state law claims, explaining that the "general rule is to dismiss state claims when the federal claims to which they are pendent are dismissed." *Parker & Parsley Petroleum Co. v. Dresser Indus.*, 972 F.2d 580, 585 (5th Cir. 1992).  Because we reverse the district court's dismissal of Blackburn's First Amendment claim against Williams and the City, we must also reverse and remand the district court's dismissal of the pendent (or supplemental) state law claims against Williams and the City.

### Conclusion

For the foregoing reasons, the judgment of the district court is AFFIRMED in part and REVERSED in part, and the cause is REMANDED.

33