# Constitutionality of Citizenship Requirement for Participation in Small Business Administration's 8(a) Program

The Small Business Administration's regulation imposing a citizenship requirement for participation in its 8(a) program for disadvantaged contractors is constitutional.

March 4, 1996

MEMORANDUM OPINION FOR THE ASSOCIATE GENERAL COUNSEL
U.S. SMALL BUSINESS ADMINISTRATION

You have requested our opinion as to the constitutionality of a regulation of the Small Business Administration ("SBA"), 13 C.F.R. § 124.103, that limits eligibility for the SBA's 8(a) program for disadvantaged contractors to businesses owned by U.S. citizens. [1] The SBA has defended the validity of its 8(a) citizenship requirement on the grounds that such a requirement is consistent with congressional intent. We agree with this conclusion, although we do so based upon a different legal analysis than the one relied upon by the SBA.

## I.

Through the Small Business Act (the "Act"), 15 U.S.C. §§ 631-656, Congress established the 8(a) program to "promote the business development of small business concerns owned and controlled by socially and economically disadvantaged individuals." 15 U.S.C. § 631(f)(2). The Act defines a "small business concern owned and controlled by socially and economically disadvantaged individuals" as "a small business concern . . . (i) which is at least 51 per centum unconditionally owned by — (I) one or more socially and economically disadvantaged individuals." *Id.* § 637(a)(4)(A). Included among the groups specifically identified as "socially disadvantaged" are "Black Americans, Hispanic Americans, Native Americans, Indian tribes, Asian Pacific Americans, Native Hawaiian Organizations, and other minorities." *Id.* § 631(f)(1)(C).

The Act mandates the creation of the SBA "to carry out the policies of this chapter," *id.* § 633(a), and it authorizes the Administrator of the SBA to "make such rules and regulations as he deems necessary to carry out the authority vested in him by or pursuant to this chapter." *Id.* § 634(b)(6). Pursuant to this authority, in 1979, the SBA promulgated regulations establishing ownership requirements for 8(a) applicants:

---

[1] Letter for Walter E. Dellinger, Assistant Attorney General, Office of Legal Counsel, from Eric S. Benderson, Associate General Counsel, U.S. Small Business Administration (July 19, 1995). It is our understanding that your request seeks advice with respect to a challenge to § 124.103 originally raised by Mr. Eugene Foley, whose correspondence to the SBA is attached to your request. Because Mr. Foley appears to challenge the constitutionality of § 124.103, our analysis is limited to the validity of the regulation under the Constitution.

> [I]n order to be eligible to participate in the 8(a) program, an applicant concern must be one which is at least 51 percent unconditionally owned by an individual(s) who is a citizen of the United States (specifically excluding permanent resident alien(s)) and who is determined by SBA to be socially and economically disadvantaged.

13 C.F.R. § 124.103.

In its preamble to the interim rule, the SBA justified the citizenship requirement as follows:

> [T]he individual's social disadvantage must be rooted in treatment which he or she has experienced in American society. Each of the statutorily designated groups has historically been abused in this country (e.g., the enslavement and subsequent disfranchisement of Blacks; the near-extermination of Native Americans). The 8(a) program is in large part designed to overcome the effects of such past injustices. It is not designed to assist newcomers to America who have been oppressed in foreign lands.

45 Fed. Reg. 79,413, 79,414 (1980).

## II.

The Supreme Court has made clear that, while states are strictly limited by the Equal Protection Clause of the Fourteenth Amendment in their ability to make distinctions between citizens and aliens,[2] the federal government enjoys far broader authority to classify on the basis of alienage. "For reasons long recognized as valid, the responsibility for regulating the relationship between the United States and our alien visitors has been committed to the political branches of the Federal Government." *Mathews v. Diaz*, 426 U.S. 67, 81 (1976). As an aspect of its plenary power over naturalization and immigration, Congress "enjoys rights to distinguish among aliens that are not shared by the States." *Nyquist v. Mauclet*, 432 U.S. 1, 7 n.8 (1977).

However, the federal power over aliens is not "so plenary that any agent of the National Government may arbitrarily subject all resident aliens to different substantive rules from those applied to citizens." *Hampton v. Mow Sun Wong*, 426 U.S. 88, 101 (1976). While federal alienage classifications imposed by Con-

---

[2] In *Graham v. Richardson*, 403 U.S. 365 (1971), the Supreme Court held that Arizona and Pennsylvania statutes that imposed durational residency requirements on aliens seeking welfare benefits violated the Equal Protection Clause of the Fourteenth Amendment. State classifications based on alienage, the Court concluded, are "subject to close judicial scrutiny." 403 U.S. at 372. In reaching this conclusion, the Court identified aliens as a "suspect class," a "prime example of a 'discrete and insular' minority [citing *United States v. Carolene Products*, 304 U.S. 144, 152-53 n.4 (1938)] for whom such heightened judicial solicitude is appropriate." *Id.*

gress or the President are subject to "relaxed scrutiny," *Nyquist*, 432 U.S. at 7 n.8, and violate the Fifth Amendment only if they are "wholly irrational," *Mathews*, 426 U.S. at 83, similar restrictions established by executive agencies without clear statutory or presidential authorization may be entitled to less deference. *See Hampton*, 426 U.S. at 103.

Our examination of the citizenship requirement of § 124.103, whether evaluated under *Hampton v. Mow Sun Wong* or more standard equal protection or due process analyses, leads us to conclude that the regulation survives constitutional scrutiny.

## A. *Hampton v. Mow Sun Wong*

In *Hampton v. Mow Sun Wong*, 426 U.S. 88 (1976), the Supreme Court addressed the question whether discriminatory restrictions imposed by executive agencies should be subjected to more careful scrutiny than those imposed by Congress or the President. At issue in *Hampton* was a Civil Service Commission regulation that excluded aliens from the federal competitive civil service. Respondents challenged the regulation under both the Equal Protection and Due Process components of the Fifth Amendment.

The Court framed the issue before it in both equal protection and due process terms:

> The rule enforced by the Commission has its impact on an identifiable class of persons who, entirely apart from the rule itself, are already subject to disadvantages not shared by the remainder of the community. . . . The added disadvantage resulting from enforcement of the rule — ineligibility for employment in a major sector of the economy — is of sufficient significance to be characterized as a deprivation of an interest in liberty.

*Hampton*, 426 U.S. at 102. Rather than relying upon a standard equal protection or due process analysis, however, the Court instead crafted an alternative analytical approach, based upon due process: [3]

---

[3] The Court specifically rejected respondents' suggestion that it apply an equal protection analysis:

> Respondents argue that this scrutiny requires invalidation of the Commission rule under traditional equal protection analysis. It is true that our cases establish that the Due Process Clause of the Fifth Amendment authorizes that type of analysis of federal rules and therefore that the Clause has a substantive as well as a procedural aspect. However, it is not necessary to resolve respondents' substantive claim, if a narrower inquiry discloses that essential procedures have not been followed.

426 U.S. at 103. The dissent took issue with this "novel conception of the procedural due process guaranteed by the Fifth Amendment," 426 U.S. at 117 (Rehnquist, J., dissenting), chastising the majority for "inexplicably meld[ing] together the concepts of equal protection and procedural and substantive due process." *Id.* at 119.

> [W]e deal with a rule which deprives a discrete class of persons
> of an interest in liberty on a wholesale basis. By reason of the Fifth
> Amendment, such a deprivation must be accompanied by due proc-
> ess. . . . When the Federal Government asserts an overriding na-
> tional interest as justification for a discriminatory rule which would
> violate the Equal Protection Clause if adopted by a State, due proc-
> ess requires that there be a legitimate basis for presuming that the
> rule was actually intended to serve that interest. If the agency which
> promulgates the rule has direct responsibility for fostering or pro-
> tecting that interest, it may reasonably be presumed that the asserted
> interest was the actual predicate for the rule.

*Id.* at 102-03. Applying this analysis, the Court dismissed various justifications
put forth by the Commission—those related to foreign affairs, treaty negotiations,
and immigration and naturalization—as being outside the agency's legitimate area
of responsibility. *Id.* at 115. The only proper concern of the agency—the pro-
motion of an efficient federal service—was, the Court concluded, not a legitimate
basis for such a broad exclusionary rule. *Id.*

As noted above, the test outlined in *Hampton* falls somewhere between a classic
equal protection and due process analysis. Pursuant to the *Hampton* approach,
where an agency adopts an alienage rule that has a serious impact on interests
entitled to due process protection, and does so without clear statutory or presi-
dential authorization, the agency must make some showing of statutory responsi-
bility for the national interests it asserts as its goals. In our judgment, the SBA
meets this requirement: the rule it wishes to adopt is directly related to its statutory
task of administering the 8(a) program and is a reasonable means of doing so.

### B. *Equal Protection*

The SBA's regulation also passes muster under a more conventional equal pro-
tection analysis. Notwithstanding the fact that "all persons, aliens and citizens
alike," are protected by the Equal Protection component of the Fifth Amendment,
Congress may nevertheless enact rules for aliens "that would be unacceptable
if applied to citizens." *Mathews*, 426 U.S. at 80. Under *Mathews*, congressional
statutes that discriminate against aliens are subject only to minimal review, the
"wholly irrational" standard noted above.

Recently, the Supreme Court confirmed that this minimal standard applies also
to equal protection challenges to restrictions imposed by executive agencies. In
*Reno v. Flores*, 507 U.S. 292 (1993), the Court reviewed an Immigration and
Naturalization Service regulation requiring unaccompanied alien juveniles to be
placed in detention, pending deportation proceedings. Rejecting the alien juve-
niles' equal protection claim that they were being treated differently from juvenile

U.S. citizens awaiting federal juvenile delinquency proceedings, the Court summarily affirmed the rationality of the policy, stating simply: "[T]he difference between citizens and aliens is adequate to support the [disparate treatment]." 507 U.S. at 306.

*Flores* suggests that federal alienage classifications imposed by an executive agency are subject to the same minimal scrutiny under the Equal Protection component of the Fifth Amendment as is applied to congressional statutes. The SBA's asserted interest in its citizenship requirement — to ensure that the 8(a) program benefits members of groups that have historically been abused in the United States and not those who only have been oppressed in foreign lands — is sufficient to satisfy this minimal standard.

## C. *Due Process*

Finally, we conclude that the regulation raises no issue under a standard procedural due process analysis because the Supreme Court's decisions establish that no constitutionally protected liberty or property interest is infringed by § 124.103. The Supreme Court has interpreted the "liberty" protected by procedural due process to include " 'not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life,. . . and generally to enjoy those privileges long recognized . . . as essential to the orderly pursuit of happiness by free men.' " *Board of Regents v. Roth*, 408 U.S. 564, 572 (1972) (quoting *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923)). Generally, liberty interests include those "human abilities that do not depend on the government." *Scott v. Village of Kewaskum*, 786 F.2d 338, 340 (7th Cir. 1986). The 8(a) program, however, is a creature of government: it upends the concept of "liberty" to claim that there is a liberty interest in a statutory program conferring preferential treatment for government contracts. *Cf. id.* ("The due process clauses are designed to establish regular procedures for governmental intervention in private affairs, and so the claim to process is at its strongest when a person simply wishes to go about life — be it personal or economic life — without encountering the prohibition of the state."); *LRL Properties v. Portage Metro Housing Auth.*, 55 F.3d 1097 (6th Cir. 1995) (holding that property owners have no liberty interest in continued participation in Section 8 housing rental assistance program).

In *Hampton*, the Supreme Court found that aliens' "ineligibility for employment in a major sector of the economy" — the federal government — was a disadvantage "of sufficient significance to be characterized as a deprivation of an interest in liberty." 426 U.S. at 102. No comparably broad interest is implicated by an applicant's participation in the SBA's 8(a) program. By excluding aliens from the 8(a) program, the SBA is not imposing on them "a stigma or other disability"

that forecloses their freedom to take advantage of other business opportunities. *Roth*, 408 U.S. at 573.

Nor does exclusion from the 8(a) program impair any property interests. To hold a property interest in a government benefit, an applicant must "have a legitimate claim of entitlement to it." *Roth*, 408 U.S. at 577. The Supreme Court has never held that an applicant for a government benefit has a constitutionally protected property interest in receiving it. *See, e.g., Walters v. National Ass'n of Radiation Survivors*, 473 U.S. 305, 320 n.8 (1985). Thus, to the extent that participation in the 8(a) program can be considered a government "benefit," applicants have no property right to that benefit. *See Software Systems Assocs., Inc. v. Saiki*, 1993 WL 294782 (D.D.C. 1993) (finding that an applicant has no property interest in participation in SBA 8(a) program); *see also Blackburn v. City of Marshall*, 42 F.3d 925, 941 (5th Cir. 1995) ("[T]he mere existence of a governmental program or authority empowered to grant a particular type of benefit to one such as the plaintiff does not give the plaintiff a property right, protected by the due process clause, to receive the benefit, absent some legitimate claim of *entitlement* — arising from statute, regulation, contract, or the like — to the benefit.").

## III.

We conclude that the citizenship requirement of 13 C.F.R. § 124.103 is constitutional. The SBA's asserted interest in its citizenship requirement satisfies both the criteria set forth in *Hampton* and the more conventional minimal rationality standard under the Equal Protection guarantee of the Fifth Amendment. The regulation is equally valid under Supreme Court decisions interpreting the Due Process guarantee of the Fifth Amendment.

WALTER DELLINGER
*Assistant Attorney General*
*Office of Legal Counsel*